Kelly N. PRYOR; Warren E. Spivey, Jr., individually and on behalf of all others similarly situated, Appellants,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Appellee.

No. 01-3113.

United States Court of Appeals, Third Circuit.

Argued April 1, 2002.

Filed May 6, 2002.

---

Andre J. Dennis (Argued), Danielle Banks, Stradley Ronon Stevens & Young, LLP, Philadelphia, PA, for Appellants.

David Bruton (Argued), Michael McTigue Jr., Drinker Biddle & Reath, LLP, Philadelphia, PA, for Appellee.

Before: SLOVITER, FUENTES and MICHEL,* Circuit Judges.

* Hon. Paul R. Michel, United States Court of Appeals for the Federal Circuit, sitting by designation.

## OPINION OF THE COURT

MICHEL, Circuit Judge.

In this close and complex appeal, we must decide whether Plaintiffs have stated a claim for purposeful, racial discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (1994) and 42 U.S.C. § 1981 (1994), by alleging (among other things) that the National Collegiate Athletic Association adopted certain educational standards because of their adverse impact on black student athletes seeking college scholarships. We hold that they have sufficiently alleged a claim for relief.

As the complaint indicates, the NCAA purportedly tried to improve graduation rates among black student athletes by adopting Proposition 16, a facially neutral rule that establishes scholarship and athletic eligibility criteria for incoming student athletes. As a result of these criteria, Plaintiffs allege, Proposition 16 has caused increased numbers of black student athletes to lose eligibility for receiving athletic scholarships and for participating in intercollegiate athletics during their freshmen year. Plaintiffs further allege that defendant knew of these effects and intended them. And thus, Plaintiffs suggest that the NCAA actually adopted Proposition 16 to "screen out" more black student athletes from ever receiving athletic scholarships in the first place, with the asserted goal of increased graduation rates serving as a mere "pretext."

Because the complaint sufficiently avers that Proposition 16 has adversely impacted the number of black student athletes who qualify for athletic scholarships, and because it alleges the NCAA adopted this otherwise facially neutral policy "because of" this adverse, racial impact, we cannot agree that the Plaintiffs—African–American student athletes who failed to meet the eligibility criteria established by Proposi-tion 16—have failed to state a claim for relief under the liberal notice-pleading requirements of Fed.R.Civ.P. 8(a).

On the other hand, we affirm the district court's holding that Plaintiff Kelly Pryor lacks standing to prosecute her discrimination claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* As the district court reasoned, Pryor may still recover the year of athletic eligibility that she lost as a freshman, depending on whether she completes 75% of her degree requirements by the time she finishes her fourth year in college. But her fourth year will not end until sometime in the future. Accordingly, because she has already irrevocably lost eligibility for her freshman year and because the NCAA may still restore that lost year of eligibility in any event, her claims for disability discrimination fail to satisfy the Constitution's Article III "case or controversy" requirements.

### I

This appeal represents the latest challenge to Proposition 16, a policy that the Division I schools of the NCAA voluntarily adopted in 1992 and fully implemented by 1996–97. To provide the proper context, we describe the role of the NCAA and Proposition 16 as well as two earlier, related appeals. Next, we describe the allegations of the complaint in this case and why the district court granted the NCAA's motion to dismiss. Following a discussion about why we, too, must review this case under the motion-to-dismiss standard (as opposed to the summary judgment standard), we address (1) the absence of standing for Pryor's ADA and Rehabilitation Act claims; (2) why Plaintiffs have sufficiently alleged facts showing a right to relief for purposeful discrimination; (3)

why even a "benign" or "laudable" goal of improving graduation rates for black athletes via the adoption of Proposition 16 still would not necessarily immunize the NCAA from liability as a matter of law; (4) why Plaintiffs' alternative theory about the NCAA's "deliberate indifference" to the impact its policy would have on a particular minority group fails to state a claim for purposeful discrimination under Title VI and § 1981; and (5) why Plaintiffs' agreement to satisfy Proposition 16's academic requirements does not defeat their § 1981 claim.

## A

Defendant NCAA is a voluntary association of more than a thousand members, mostly consisting of public and private four-year universities that have varsity intercollegiate athletic programs. The NCAA member universities divide themselves by divisions: Division I, Division II and Division III. Each division ordinarily adopts its own bylaws. These bylaws include rules for defining freshmen eligibility for intercollegiate athletic competition. For example, in 1986, the Division I members adopted Proposition 48, which required incoming high school athletes to have a minimum grade point average of 2.0 and a minimum 700 score on the Scholastic Aptitude Test in order to practice, play and receive an athletic scholarship. As this court has previously stated, the Division I members implemented Proposition 48 to address the perception that its member schools were exploiting athletes "for their talents without concern for whether they graduated." *Cureton v. Nat'l Collegiate Athletic Assoc.*, 198 F.3d 107, 110 (3d Cir.1999). Following the implementation of Proposition 48, graduation rates among athletes, especially among black athletes, increased.

## B

In 1992, the Division I schools voluntarily adopted the NCAA's Proposition 16, the provision at issue in this case. Proposition 16 modifies Proposition 48 by increasing the number of core high school courses in which a student athlete must have a minimum GPA, and it determines athletic eligibility based on a formula that combines a student-athlete's GPA and standardized test score. Proposition 16 essentially increases the minimum scores that a high school student athlete must attain to qualify for athletic scholarship aid and eligibility for practicing and competing as a college freshman. For example, if a student athlete had a 2.0 GPA in the core high school courses, he or she must score a 1010 on the SAT. The district court found in a similar case that Proposition 16 puts a greater emphasis on standardized test scores than did its predecessor (Proposition 48).

### *Cureton I*

In 1997, counsel for Plaintiffs in this case sued the NCAA on behalf of different minority student athletes who claimed that Proposition 16 violated the regulations to Title VI of the 1964 Civil Rights Act. *Cureton v. Nat'l Collegiate Athletic Assoc.*, 198 F.3d at 111 (*"Cureton I"*). Specifically, the *Cureton* plaintiffs alleged a Title VI violation based on the theory that Proposition 16 creates a disparate impact on racial minorities. *Id.* Following discovery, the district court concluded that Proposition 16's disparate impact on African–American athletes violated the regulations to Title VI; and so, the court permanently enjoined the continued enforcement of Proposition 16. In so doing, the court accepted the NCAA's proffered goal of implementing Proposition 16 as a way to raise all student-athletes' graduation rates, but it rejected Proposition 16 as a legitimate

means for accomplishing that goal. Further, the court held that although Proposition 16 may benefit black athletes by improving their overall graduation rate, it still adversely impacted minority athletes at the "front end" of the process, *i.e.*, the eligibility of freshmen minority athletes.

This court reversed and remanded with instructions for the entry of judgment for the NCAA. In the court's analysis, the regulations applied only to the specific programs or activities for which an entity uses federal funds, not to the entity at large. *See Cureton I*, 198 F.3d at 114. As a result, the court reasoned, even assuming the NCAA received federal funds, the Title VI regulations did not apply to the NCAA because the NCAA did not exercise "controlling authority" over its member institutions' "ultimate decision" about a student-athlete's eligibility to participate in collegiate athletics. *See id.* at 116–17 (citing and discussing *NCAA v. Tarkanian*, 488 U.S. 179, 197–99, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988)).

Roughly one year after this decision, the Supreme Court held that Title VI creates no claim for disparate impact, contrary to the theory alleged by the plaintiffs in *Cureton I*: "Title VI itself directly reach[es] only instances of intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 281, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

### Cureton II

On remand to the district court, the *Cureton* plaintiffs moved to either amend their complaint or to have the judgment altered so as to add a claim of intentional discrimination based on the NCAA's "adoption and/or enforcement of Proposition 16." Citing undue prejudice, delay and futility (*i.e.*, some of the factors used to assess a motion to amend a complaint or judgment), the district court denied the motion. This court affirmed on the grounds of undue prejudice and delay only. *Cureton v. Nat'l Collegiate Athletic Assoc.*, 252 F.3d 267, 274–76 (3d Cir.2001) ("*Cureton II*"). Requiring the NCAA to address this intentional discrimination claim would essentially require it to re-litigate the entire case again. *Id.* In addition, the *Cureton* plaintiffs admitted that they could have filed an intentional discrimination claim years ago; they simply chose not to do so based on the putative strength of their disparate impact claim. *See id.* at 275. Last, the NCAA had no notice that the *Cureton* plaintiffs might later add this intentional discrimination claim, since the plaintiffs themselves had described the NCAA's motives behind Proposition 16 as "laudable." *Id.*

### C

This dispute very much resembles the *Cureton* case, with the variant that Plaintiffs here allege that the NCAA purposefully discriminated against them by adopting Proposition 16. Indeed, as the NCAA notes, some of the allegations in the current complaint come verbatim from the allegations lodged in the amended complaint in *Cureton II*. In addition, the 49-page complaint in this case contains several attachments, including various NCAA memoranda, affidavits from NCAA officials, an interrogatory response that the NCAA provided in the *Cureton* litigation, as well as other discovery obtained during that case. The complaint frequently mentions the *Cureton* litigation, including the discovery obtained therein.

According to the complaint, Plaintiff Kelly Pryor is an African–American student athlete recruited by San Jose State to play varsity soccer. Pryor has a learning disability. In 1999, as a high school athlete, she signed an agreement, called a National Letter of Intent ("NLI"), to play

soccer on a scholarship at San Jose State beginning in the fall of 1999. Plaintiff Warren Spivey is an African–American student athlete who signed an NLI to play football at the University of Connecticut ("UConn"). As with the NLIs signed by all student athletes who receive athletic scholarships, the NLIs signed by Pryor and Spivey contain a condition that would render the agreement void if they failed to meet the eligibility requirements established in Proposition 16.

Neither Pryor nor Spivey met these requirements. Pryor, however, did petition for a waiver based on her learning disability. As a result, she received "partial qualifier" status, meaning she retained her athletic scholarship and could still practice with the San Jose State soccer team; she just could not compete in the team's games. In addition, in August 1999, the NCAA instituted Bylaw 14.3.3.2, which grants learning-disabled students (like Pryor) five years to use their four years of athletic eligibility, provided that the learning-disabled student completes 75% of her degree requirements by the end of her fourth year at the university. Non-learning disabled student athletes, by contrast, must complete 100% of their degree requirements by the end of their fourth year if they wish to stay a fifth year and use whatever athletic eligibility is remaining. Pryor will presumably reach the end of her fourth year at San Jose State by 2003.

Spivey himself, meanwhile, did not petition for a waiver; but UConn did so on his behalf, arguing that Spivey's record showed that he was prepared for the academic requirements of college. The NCAA denied this petition, as well as the appeal thereto, meaning Spivey could not receive athletically related financial aid or participate in varsity athletics during his freshman year. According to the complaint, Spivey still attends UConn, but he

incurred substantial debt, *i.e.,* student loans, in order to pay his college tuition.

Under Proposition 16, student athletes who fail to meet the eligibility criteria as freshmen may still compete in varsity athletics beginning their sophomore year, provided they meet other minimum academic criteria. Also, Proposition 16 relates only to the award of athletic scholarships; no NCAA policy stops a university from giving a Proposition 16 "casualty" the financial aid that is available to all students. None of the post-freshmen year criteria are at issue in this case.

### Pryor and Spivey Sue the NCAA

In February 2000, Pryor and Spivey sued the NCAA and sought to certify a class against it. Pryor alleged that Proposition 16 discriminated against her on account of her learning disability, in violation of the Americans with Disabilities Act and the Rehabilitation Act, and she sought injunctive and declaratory relief so as to remedy the loss of her freshman eligibility. In addition, both Pryor and Spivey alleged that, by adopting Proposition 16, the NCAA intentionally discriminated against them on account of their race, in violation of Title VI of the Civil Rights Act and 42 U.S.C. § 1981.

As support for their race-discrimination claims, Plaintiffs' complaint cites often to NCAA memoranda and other evidence obtained during the *Cureton* litigation. In particular, the complaint notes that the NCAA responded to an interrogatory about its reasons for adopting Proposition 16 by identifying (as one of its "top ten reasons") the goal that Proposition 16 would promote a higher graduation rate for black athletes and would thereby narrow the "Black/White Gap" between black student-athlete graduation rates and white student-athlete graduation rates. (Pls.' Compl. ¶¶ 62–63.) Citing statements from

the district court's now-vacated decision in *Cureton I,* the complaint asserts that Proposition 16's "explicit race-based goal stands in stark contrast to the characterization of Proposition 16 as a facially neutral rule." (*Id.* ¶ 64) (quoting *Cureton v. NCAA,* 37 F.Supp.2d 687, 705 (E.D.Pa. 1999)). Further, it professes a reliance, in part, on the "serious questions" the *Cureton* court itself had about whether Proposition 16 "function[ed] simply as a proxy for a racial quota." (*Id.* ¶ 64) (quoting *Cureton, supra.*)

In addition, the complaint identifies a memorandum from the NCAA dated July 1998 asserting that Proposition 48 and Proposition 16 have led to steady increases in the graduation rates for minorities and that no other proposed models would achieve that goal as well as Proposition 16 has. (*Id.* ¶ 65.) An affidavit from Graham Spanier, a former member of various NCAA committees, similarly avers that Proposition 48—the precursor to Proposition 16—had significantly improved graduation rates of student athletes, with the greatest increase coming among black student athletes. (*Id.* ¶ 66.) And another memorandum from an NCAA statistician calculates the projected graduation rates for black and white athletes under the Proposition 16 model as well as three alternative models. (*Id.*) The memorandum indicates that Proposition 16 projected the highest graduation rate for black and white athletes.

Liberally construed, the complaint maintains that Proposition 16 achieves the NCAA's stated goal of improving graduation rates for black athletes relative to white athletes by simply "screen[ing] out" greater numbers of black athletes from ever becoming eligible in the first place, *i.e.,* from ever receiving athletic eligibility and scholarship aid. (*E.g.,* Pls.' Compl. ¶¶ 20, 29, 66, 159, 162, 177.) Further, it maintains that although the NCAA knew that Proposition 16 would have a more adverse impact on black student athletes than on white student athletes, the NCAA went ahead and adopted Proposition 16 anyway, based on its "misguided view toward affecting African–American student-athletes' graduation rates by denying [scholarship] eligibility to greater numbers of" black student athletes. (*Id.* ¶¶ 69, 76.) As support for this assertion, the complaint points to various studies, research and reports by the NCAA showing that Proposition 16 and its precursor (Proposition 48) would disproportionately and negatively impact black student athletes. (*E.g.,* Pls.' Compl. ¶¶ 71–75.)

Citing these allegations, the complaint also lays out two theories of relief under Title VI and § 1981. First, it asserts that because the NCAA adopted Proposition 16 knowing that it would adversely affect black student athletes, the NCAA thereby acted with "deliberate indifference" to Proposition 16's impact on African–American student athletes. (*Id.* ¶¶ 164–66, 178.) And that indifference, the theory goes, amounts to the purposeful discrimination proscribed by Title VI and § 1981. (*See id.*) Alternatively, the complaint indicates that the evidence of the NCAA's knowledge about Proposition 16's impact as well as other "circumstantial evidence" establishes that the NCAA adopted this policy to intentionally deny athletic eligibility and scholarship aid to a greater number of black athletes. (*See, e.g.,* Pls.' Compl. ¶¶ 20, 81, 169.) "Any suggestion" that considerations of race did not at least partially motivate the NCAA's adoption of Proposition 16 is "pretextual." (*Id.* ¶¶ 83, 180.)

In response, the NCAA moved to dismiss Plaintiffs' complaint under Fed. R.Civ.P. 12(b)(6) or, alternatively, for summary judgment.

**The district court grants the NCAA's Motion to Dismiss**

In July 2001, the district judge—the same judge that handled the *Cureton* litigation—granted the NCAA's motion to dismiss. As to Pryor's ADA and Rehabilitation Act claims, the court determined that Pryor lacked standing to effectively remedy her asserted loss of freshman eligibility. Specifically, the court held that while Pryor's complaint satisfied the constitutional standing requirements of injury and causation, it did not meet the third prong concerning legal or equitable redress. This was so, the court explained, because the NCAA itself may still grant her the relief she seeks via Bylaw 14.3.3.2—the rule granting learning-disabled athletes five years to play four years of varsity athletics if they complete 75% of their degree requirements. In addition, the court rejected Pryor's argument that, because she has to "earn back" her fourth year of eligibility, she still had standing to prosecute her ADA claim. As the district court noted, any claim that Pryor now brought to recover for her fourth year of eligibility would fail for ripeness as Pryor had simply "not yet reached her fourth year" at San Jose State.

In addition, the court dismissed the two theories that Pryor and Spivey advanced to show purposeful discrimination. First, in the district court's analysis, Plaintiffs' theory about the NCAA's "deliberate indifference" could not stand because, under *Alexander v. Sandoval, supra,* the Supreme Court has held that even if a federally funded entity knowingly adopts a rule that creates a disparate impact, Title VI still affords no remedy. Second, Plaintiffs alleged that a discriminatory purpose played a motivating factor in the NCAA's development and adoption of Proposition 16. But Proposition 16 is a facially neutral policy, the court stated; and policies that incidentally create a racially disparate impact (as opposed to policies that intentionally create a disparate impact) do not abridge Title VI or § 1981. Further, the court determined that the NCAA's monitoring of the effects that its policies have upon minority athletes does not suggest that the NCAA improperly considered race in either the promulgation or continued enforcement of Proposition 16. Last, the court reasoned that Proposition 16 was motivated by the desire to improve graduation rates for all student athletes, leading the court to "find" that the NCAA's design and implementation of Proposition 16 occurred "in spite of" its alleged disparate impact, not "because of" that impact.

Finally, the district court dismissed Pryor and Spivey's § 1981 claim. As stated earlier, Plaintiffs had failed "to adequately allege intentional discrimination and this deficiency merits dismissal of this [§ 1981] claim." Alternatively, the court held that Plaintiffs had also failed to allege harm to the contracting activity protected by § 1981; the NCAA's Proposition 16 did not prevent either Pryor or Spivey from entering into a "contract" (*i.e.*, an NLI) with their respective universities and it did not bar them from enjoying the benefits of those contracts either, since their NLIs were conditioned on Plaintiffs satisfying the eligibility requirements of Proposition 16. Accordingly, the court concluded that because Pryor and Spivey had entered into these NLIs and accepted their conditions, they could not now disregard them for purposes of § 1981.

This appeal followed. We have jurisdiction under 28 U.S.C. § 1291 (1994) and now affirm in part, reverse in part and remand.

**II**

Both parties make numerous arguments on appeal, some going well beyond the

558

rulings actually made by the district court. For her part, Plaintiff Pryor asserts that she did not lack standing to bring her ADA and Rehabilitation Act claims because the district court could have granted the requested relief without speculating whether that relief (an injunction and declaratory judgment) would have remedied the loss of her freshman eligibility. Along those same lines, she argues that NCAA Bylaw 14.3.3.2 did not "confer relief remotely comparable to the relief" she now seeks, as she would still have to "earn back" her fourth year of eligibility instead of receiving it automatically like other student athletes.

As to the intentional discrimination claims, Plaintiffs argue that the district court improperly relied on *Cureton* to hold that the NCAA adopted Proposition 16 "in spite" of its allegedly adverse impact, not "because of" that disproportionately adverse impact. In so doing, Plaintiffs suggest that the district court was relying on *Cureton* as if the NCAA had invoked notions of collateral estoppel, res judicata or law of the case.

Addressing the same issue, Plaintiffs further argue that the district court misunderstood the basis of their alternative theory that the NCAA had acted with "deliberate indifference" to the disparate impact created by the adoption of Proposition 16. "The claim is not merely that the NCAA was deliberately indifferent to Proposition 16's disparate impact. The claim is that the NCAA was (and is) deliberately indifferent to Plaintiffs' rights as secured under Title VI . . . ." (Appellants' Br. at 29.) According to Plaintiffs' brief, the "essence of Plaintiffs' deliberate indifference claim is that even if . . . the NCAA did not intend to discriminate against African–American student athletes, its conduct is so deliberately indifferent to Plaintiffs' rights as secured by those statutes that it might as well have intended to discriminate." (Appellants' Br. at 31.)

Next, referring to the evidence identified in their complaint, Plaintiffs assert that the admissions by the NCAA about adopting Proposition 16 to raise graduation rates for black athletes constitute "direct evidence" of the NCAA's decision to take race into account. Plaintiffs extrapolate from these admissions an intent to adopt a policy that would exclude more black athletes from scholarships or freshmen participation (Appellants' Br. at 37), saying further that, "[a]t the heart" of their claim, they allege "the NCAA uses Proposition 16 as a vehicle to exclude greater numbers of African American student-athletes in order to wrongfully claim that it is decreasing the Black/White graduation gap and wrongfully claim that Proposition 16 has caused an increase in overall graduation rates." Plaintiffs assert that they have the right to present the evidence of the NCAA's race-based intent to a jury.

Last, Plaintiffs recognize that the NLIs they signed do contain the condition about having to meet the eligibility requirements established by Proposition 16. But they begin another argument that Proposition 16 purposefully discriminates against black athletes. Importantly, as does their complaint, they also suggest that the NLI's Proposition 16 condition is invalid, given that it is allegedly the product of intentional discrimination.

In response, the NCAA first notes that we may affirm the judgment as based on either a motion to dismiss or as a summary judgment motion. Further, it identifies various principles of the Article III "case or controversy" analysis as barring Plaintiff Pryor's ADA and Rehabilitation Act claims—mootness, ripeness and, as to the core standing requirements, failure to allege an injury that a court could presently redress. Also, on the merits of Pryor's

ADA and Rehabilitation Act claims, the NCAA asserts that these claims must fail because Proposition 16 merely embodies academic standards that are necessary to accomplish legitimate educational objectives.

As to Plaintiffs' intentional discrimination claims, the NCAA maintains that an "unwavering line of [Supreme Court] decisions" shows that purposeful discrimination "*requires proof of racial animus; that is, an intention to harm racial minorities.*" (Appellee's Br. at 11) (emphasis added). In that vein, the NCAA continues, Plaintiffs cannot seize upon the NCAA's admissions of trying to help black athletes as instead warranting an inference that it actually intended to discriminate against and harm black student athletes. Meanwhile, the NCAA argues, Plaintiffs' restatement of their "deliberate indifference" claim merely "assumes its own conclusion"; it does not distinguish that claim from precedents that have upheld a facially neutral policy that happened to create a disparate impact.

As to Plaintiffs' § 1981 claim, the NCAA again adopts the district court's reasoning, saying that because the NLI contained a condition about meeting Proposition 16's eligibility requirements, the NCAA did not deprive Plaintiffs of the right to make or otherwise enjoy the benefits of their respective NLI contracts. In other words, because Plaintiffs themselves had failed to meet a condition of their own agreement, the NCAA did not prevent them from enjoying the benefits of their NLI contract; rather, Plaintiffs had simply deprived themselves of that right by failing to meet one of the NLI conditions.

### III

We review the district court's decision granting a party's motion to dismiss *de novo*. A court should not dismiss a complaint under Rule 12(b)(6) for failure to state a claim for relief "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In evaluating whether dismissal is proper, a court must accept all the "factual allegations of the complaint ... as true," and must draw all "reasonable inferences ... to aid the pleader." *D.P. Enter. v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984).

■ In this case, however, the NCAA filed a motion to dismiss under Fed. R.Civ.P. 12(b)(6) or, in the alternative, a motion for summary judgment under Fed. R.Civ.P. 56. In addition, Plaintiffs refer to several exhibits attached to their complaint, many of which concern the NCAA's decision to adopt Proposition 16. The evidence here, in other words, became part of the record on appeal because Plaintiffs had attached it to their complaint—not because either party had independently come forward and presented that evidence as matters outside the pleadings. And, as previously noted, Plaintiffs assert error with the district court's references to the *Cureton* litigation, even though Plaintiffs' own complaint repeatedly cites and quotes from various portions of that decision. We dispose of this argument now and, in so doing, hold that we too must treat this appeal as if we are reviewing the grant of a motion to dismiss only, not a motion for summary judgment.

■ Generally speaking, a trial court has discretion to address evidence outside the complaint when ruling on a motion to dismiss. *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir.1992) (citing 5A Wright & Miller, Fed. Prac. & Proc. § 1366, at 491 (1990)). Further, as one treatise has explained, simply attaching exhibits to a

complaint does not necessarily make that complaint amenable only to summary judgment or foreclose a court from considering those exhibits in its Rule 12(b)(6) ruling:

> As a general rule, the court may only consider the pleading which is attacked by an FRCP 12(b)(6) motion in determining its sufficiency. * * * The court is not permitted to look at matters outside the record; if such matters are considered, the FRCP 12(b)(6) motion to dismiss is, by the express terms of FRCP 12(b), converted into a motion for summary judgment. However, the court may consider documents which are *attached* to or submitted with the complaint, as well as legal arguments presented in memorandums or briefs and arguments of counsel. Further, documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered. * * * Documents that the defendant attaches to the motion to dismiss *are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim*; as such, they may be considered by the court.

62 Fed. Proc., L.Ed. § 62:508 (citations omitted) (emphases added); *see also* 62 Fed. Proc., L.Ed. § 62:520 ("As previously discussed, certain matters outside the body of the complaint itself, such as exhibits attached to the complaint and facts of which the court will take judicial notice, will not trigger the conversion of an FRCP 12(b)(6) motion to dismiss to an FRCP 56 motion for summary judgment.").

Applying these principles, we discern no error with the district court's references to the *Cureton* litigation, as the body of the complaint itself expressly references the findings and statements made in that factually similar case. Contrary to Plaintiffs' argument, moreover, the district court did not appear to cite *Cureton* for purposes of assessing the truth of the factual allegations in this case, much less for applying principles of claim or issue preclusion or law of the case; rather, the court cited *Cureton* as precedent only. Accordingly, Plaintiffs' argument on this point fails.

## IV

Applying the Rule 12(b)(6) standard, we uphold the dismissal of Plaintiff Pryor's claims under the ADA and the Rehabilitation Act. As the district court reasoned, the court cannot order the declarative or injunctive relief Pryor seeks if the NCAA may later award her that relief anyway. And we will not know if the NCAA will do this until 2003 or so, meaning her disability claims fail for both lack of redress and lack of ripeness.

On the other hand, while we reject Plaintiffs' "deliberate indifference" theory, the complaint and exhibits have stated a claim for relief for purposeful discrimination. As more fully explained below, the complaint and exhibits show that the NCAA expressly considered race and how Proposition 16 would affect African–American athletes when it adopted this policy. Further, though the NCAA may have intended this race-based consideration for the "laudable" goal of increasing graduation rates for black student athletes, the complaint indicates that the policy was actually adopted to harm black athletes by preventing them from ever receiving college athletic scholarships and eligibility in the first place. Moreover, contrary to the assertions made in the NCAA's brief, none of the case law it cited, much less Supreme Court case law, absolves a decisionmaker from liability simply because it considered race for the "benevolent" purpose of helping a particular racial group. Indeed, the Supreme Court has made clear that con-

siderations of race, well intentioned or not, can still subject a decisionmaker to liability for purposeful discrimination.

Last, the § 1981 claim must stand as well. Simply put, Plaintiffs could not legally consent or otherwise agree to a contract term or condition, *e.g.*, the condition of complying with Proposition 16's academic requirements, if that condition was itself the product of purposeful racial discrimination. Thus, we reverse and remand on this claim too.

## A

■■■ Constitutional standing requires pleadings that show (1) a legally recognized injury; (2) caused by the named defendant or at least "fairly traceable to the challenged action of the defendant"; and (3) that a favorable decision by the court would likely redress. *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Redress, the third prong, will "deprive[ ] a court of jurisdiction over cases in which the likelihood that the requested relief would remedy the plaintiff's injury is 'only speculative.'" *In re Thornburgh*, 869 F.2d 1503, 1511 (D.C.Cir.1989) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 618, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)).

■■■ In cases where a plaintiff seeks injunctive or declaratory relief only, moreover, standing will not lie if "adjudication ... rests upon 'contingent future events that may not occur as anticipated or indeed may not occur at all.'" *Hodgers–Durgin v. De La Vina*, 199 F.3d 1037, 1044 (9th Cir.1999) (quoting *Texas v. United States*, 523 U.S. 296, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)). Indeed, in "ADA cases, courts have held that a plaintiff lacks standing to seek injunctive relief unless he alleges facts giving rise to an inference that he will suffer future discrimination by the defendant." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir.2001) (citations omitted); *see also Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 422 (3d Cir.1992) (discussing how courts should dismiss action on ripeness grounds when a complaint seeking declaratory relief rests on the contingency that some future act will occur).

Here, we uphold the dismissal of Plaintiff Pryor's ADA and Rehabilitation Act claims because we cannot tell yet whether Pryor will receive a fourth year of athletic eligibility. As the district court noted, Pryor has no claim for damages under the ADA because she still received her athletic scholarship via the partial waiver she obtained. Further, she may not need declarative or injunctive relief. NCAA Bylaw 14.3.3.2 allows learning-disabled athletes like Pryor to receive a fourth year of athletic eligibility—and thus recover the year of eligibility they lost as freshmen—if they compete 75% of their degree requirements by the end of their fourth year. But the end of Pryor's fourth year will not arrive until the spring of 2003 or so. Accordingly, if she meets the 75% requirement by that time, she will receive her fourth year of athletic eligibility and thereby receive all the requested relief she sought via her ADA and Rehabilitation Act claims. In other words, she will have rendered moot any claim for injunctive relief that would order the NCAA to declare her eligible for a fourth year of intercollegiate soccer. We note too that, at oral argument, Plaintiffs' counsel stated that Pryor is doing well both academically and athletically. This statement only strengthens the likelihood that Pryor may not need judicial intervention at all.

Therefore, because we can only speculate that Pryor may someday lose a fourth year of eligibility based on some future event, *i.e.*, the failure to meet 75% of her degree requirements by the end of her

fourth year at San Jose State, the district court correctly determined that no constitutional standing lies over Pryor's ADA and Rehabilitation Act claims. Consequently, we need not address the substance of Pryor's claims under the ADA and the Rehabilitation Act.

**B**

As stated, Plaintiffs' complaint and attached exhibits sufficiently allege a claim for purposeful discrimination in the adoption of an otherwise facially neutral policy. In effect, the complaint states that the NCAA purposefully discriminated against black student athletes by adopting a policy with the intent to reduce the number of black athletes who could qualify for athletic scholarship aid. We address this theory first and Plaintiffs' "deliberate indifference" theory thereafter.

**1**

■ To recover under Title VI or § 1981, Plaintiffs cannot simply assert that Proposition 16 has a disproportionate effect on certain minorities. *See, e.g., Stehney v. Perry,* 101 F.3d 925, 937 (3d Cir. 1996) ("[A] facially neutral policy does not violate equal protection solely because of disproportionate effects."). As the parties agree, Title VI and § 1981 provide a private cause of action for intentional discrimination only. *Alexander v. Sandoval,* 532 U.S. at 281 (Title VI); *Gen. Bldg. Contractors Assoc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (§ 1981).

■ To prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decisionmaker (*e.g.,* a state legislature) adopted the policy at issue " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99

S.Ct. 2282, 60 L.Ed.2d 870 (1979); *accord Gen. Bldg. Contractors Assoc.,* 458 U.S. at 391, 102 S.Ct. 3141. A mere awareness of the consequences of an otherwise neutral policy will not suffice. *Feeney,* 442 U.S. at 277–78, 99 S.Ct. 2282 (holding that state legislature did not intentionally discriminate against women by enacting laws that gave hiring preferences to veterans even though the legislature was undoubtedly aware that most veterans were men; the legislative history underlying these preferences showed that the legislature always intended to offer the veterans' preference for "any person").

■ Once a plaintiff establishes a discriminatory purpose based on race, the decisionmaker must come forward and try to show that the policy or rule at issue survives strict scrutiny, *i.e.,* that it had a compelling interest in using a race-based classification and this classification is narrowly tailored to achieve that compelling interest. *See, e.g., Shaw v. Reno,* 509 U.S. 630, 643, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ("These principles [of strict scrutiny] apply not only to legislation that contains explicit racial distinctions, but also to those 'rare' statutes that, although race neutral, are, on their face, 'unexplainable on grounds other than race.' ") (quoting *Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). Racial classifications, well intentioned or not, must survive the burdensome strict scrutiny analysis because " 'absent searching judicial inquiry . . . there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.' " *Id.* (quoting *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)). This appeal involves only whether the NCAA intended to discrimi-

nate against black athletes by adopting Proposition 16, not whether that policy survives strict scrutiny.

"Determining whether invidious discriminatory purpose was a motivating factor [in the adoption of a facially neutral policy] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555; *Hunt v. Cromartie,* 526 U.S. 541, 546, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (applying the Arlington Heights criteria to a voting district allegedly drawn along racial lines). Although considering evidence of impact would seem to contradict the principle that no claim for disparate impact lies under Title VI or § 1981, *see Gen. Bldg. Contractors Assoc.,* 458 U.S. at 397, 102 S.Ct. 3141 ("It would be anomalous to hold that § 1981 could be violated only by intentional discrimination and then to find this requirement satisfied by proof that the individual plaintiffs did not enjoy 'the same right' [as other citizens] and that the defendants merely failed to ensure that the plaintiffs enjoyed employment opportunities equivalent to that of whites."), the Supreme Court has more directly stated that the "important starting point" for assessing discriminatory purpose is the "impact of the official action" and "whether it bears more heavily on one race than another." *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555; *Reno v. Bossier Parish School Bd.,* 520 U.S. 471, 489, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997). As the Court has explained, the "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Bossier Parish School Bd.,* 520 U.S. at 487, 117 S.Ct. 1491.

Other considerations relevant to the purpose inquiry include the "historical background of the … decision; [t]he specific sequence of events leading up to the challenged decision; [d]epartures from the normal procedural sequence; and [t]he legislative or administrative history, especially … [any] contemporary statements by members of the decisionmaking body." *Id.; accord Arlington Heights,* 429 U.S. at 267–68, 97 S.Ct. 555. Owing perhaps to the principle that questions of intent and state of mind are ordinarily not amenable to summary adjudication, *see, e.g.,* 10B Wright & Miller, Fed. Prac. & Proc. § 2730, courts have only reluctantly upheld the Rule 12(b)(6) dismissal of a claim alleging unlawful discrimination in the adoption of an otherwise facially neutral policy. *See, e.g., Stehney v. Perry,* 101 F.3d 925, 937–38 (3d Cir.1996) (affirming dismissal of claim challenging a facially neutral policy as discriminatory against women when "Stehney did not allege that the facially neutral exemption from the polygraph requirement was adopted with the intent to discriminate against women"); *contra Hunt v. Cromartie,* 526 U.S. at 549–52, 119 S.Ct. 1545 (applying *Arlington Heights* criteria and vacating summary judgment on claim that state legislature had purposefully drawn voting district along racial lines when competing evidence showed that politics may have motivated the legislature, not race); *Shaw v. Reno,* 509 U.S. 630, 658, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (vacating district court's dismissal of challenge to facially neutral action when complaint alleged that the State had deliberately segregated voters into districts on the basis of race without compelling justification); *see also Gen. Bldg. Contractors Assoc.,* 458 U.S. at 395–97, 102 S.Ct. 3141 (reversing findings of purposeful discrimination that a district court rendered after trial); *Feeney,* 442 U.S. at 277–78, 99 S.Ct. 2282 (upholding findings made after compilation of a "record" that the Massachusetts legislature did not intentionally discriminate against wom-

564

en by enacting veterans-preference laws); *Arlington Heights*, 429 U.S. at 259, 269–70, 97 S.Ct. 555 (upholding trial court's findings that a local housing authority did not purposefully discriminate on the basis of race by denying a facially neutral application to have certain property re-zoned as multi-family housing).

## 2

In this case, Plaintiffs have stated a claim for purposeful discrimination. As we are reviewing this case at the Rule 12(b)(6) stage, we may affirm the judgment only if "it appears beyond doubt that no set of facts would entitle" Plaintiffs to relief. *See Conley v. Gibson, supra.* In addition, as the Supreme Court has recently confirmed, a complaint requires only a "short and plain statement" to show a right to relief, not a detailed recitation of the proof that will in the end establish such a right. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (discussing the notice-pleading requirements of Fed.R.Civ.P. 8(a)(2) for claims alleging intentional discrimination); *see also* Fed.R.Civ.P. 9(b) (enumerating specific claims and defenses that require particularized allegations but omitting intentional discrimination as one such claim or defense). "Malice, *intent,* knowledge, and other *condition of mind* of a person may be averred *generally.*" Fed. R.Civ.P. 9(b) (emphasis added).

Here, it does not appear beyond doubt that Plaintiffs have failed to sufficiently allege facts showing purposeful discrimination by the NCAA. The complaint and attached exhibits make clear that the NCAA considered race as one of its reasons for adopting Proposition 16, with the NCAA stating explicitly that it believed the adoption of this policy would increase the graduation rates of black athletes relative to white athletes. Further, the com-

plaint alleges that the NCAA purposefully discriminated against black student athletes (like Plaintiffs) when it adopted Proposition 16 because the NCAA knew—via various studies and reports—that the heightened academic requirements of Proposition 16 would effectively "screen out" or reduce the percentage of black athletes who could qualify for athletic scholarships. In short, the complaint alleges that the NCAA adopted Proposition 16 because it knew that policy would prevent more black athletes from ever receiving athletic scholarship aid in the first place.

Citing *Feeney*, 442 U.S. at 279, 99 S.Ct. 2282, the district court rejected this theory, holding that the NCAA adopted Proposition 16 "in spite of" its impact on black athletes, not "because of" that impact. But as shown by the complaint, this is not a case where the NCAA simply realized or otherwise could have guessed that Proposition 16 would have had a disparate impact on black athletes. In *Feeney*, after all, the Supreme Court upheld a policy that favored veterans only after the compilation of a record showed that, yes, the state legislature almost certainly was aware that most military veterans were men; and that, as a result, a law expressly benefiting veterans would work to the detriment of women. Rather, this is a case where, based on the face of the complaint and all reasonable inferences thereto, the NCAA at least partially intended to reduce the number of black athletes who could attend college on an athletic scholarship by adopting the heightened academic requirements of Proposition 16. And as the exhibits and complaint allege, the NCAA knew of this impact because of the pre-Proposition 16 studies informing them about this outcome. *See Bossier Parish School Bd.*, 520 U.S. at 489, 117 S.Ct. 1491 (explaining that the "impact of an official action" bears on the analysis whether a decisionmaker

adopted a facially neutral policy for purposes of race, "since people usually intend the natural consequences of their actions"); *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555.

Moreover, unlike *Feeney* and nearly all the other precedents cited by the district court and the parties, the district court drew this distinction between the NCAA's "awareness" and its "purpose" at the pleading stage, even though issues involving state of mind (*e.g.*, intent) are often unsuitable for a Rule 12(b)(6) motion to dismiss. Indeed, of all the precedents cited, few have upheld the dismissal of a purposeful discrimination claim for failure to state a claim for relief. In *Stehney*, for example, unlike here, we affirmed the dismissal of a claim for purposeful discrimination, reasoning that the complaint had simply failed to allege that the facially neutral classification at issue "was adopted with the intent to discriminate against" a protected trait (gender). 101 F.3d at 937–38. But again, liberally construing the allegations, the complaint here conveys that the NCAA adopted Proposition 16 because it allegedly wanted to reduce the number of black athletes who could ever become eligible for athletic scholarships. The complaint further suggests that the NCAA's "stated goal" of wanting to improve graduation rates via Proposition 16 served as a mere "pretext" for its actual goal. (*See* Pls.' Compl. ¶¶ 83, 180.)

In *Brown v. Philip Morris Inc.*, meanwhile, we upheld the dismissal of a § 1981 claim by a class of black smokers alleging that tobacco companies had purposefully discriminated against them in the sale and advertising of tobacco products. 250 F.3d 789, 797 (3d Cir.2001). There, the complaint did not allege that the tobacco companies had deprived these smokers of the right to contract for, purchase or use their cigarettes; indeed, the plaintiffs conceded that the companies sold the same cigarettes on the same terms to black customers as they did to white customers. *Id.* In short, the plaintiffs pointed to no disparities in the companies' sales of cigarettes "apart from the generalized allegation that African–Americans are more likely than others to buy … tobacco products as a result of targeted advertising." *Id.* at 799.

Here, by contrast, the complaint alleges that the NCAA purposefully adopted a policy because that policy would reduce the number of black athletes who could receive athletic scholarships and compete in intercollegiate athletics as freshmen. Further, the complaint indicates that the NCAA knew this policy, Proposition 16, would and has adversely affected black student athletes, not white student athletes, because of the pre-Proposition 16 studies that informed them of this outcome. In other words, unlike the complaint in *Brown*, the complaint in this case does sufficiently state facts showing intentional, disparate treatment on account of race.

**3**

The NCAA asserts that both the complaint and the exhibits thereto show only that the NCAA intended to help black athletes by adopting Proposition 16, not harm them. In like vein, it claims that precedent from the Supreme Court, as well as from rulings by other circuit courts, consistently absolve decisionmakers from purposeful-discrimination liability so long as their intent was "benign" or (in the words of Plaintiffs' counsel in *Cureton*) "laudable." For two reasons, however, this argument is unconvincing.

First, as explained above, the complaint adequately alleges that the NCAA sought to achieve its stated goal of improving graduation rates by using a system that would exclude more African–American

freshmen who, in the past, might have qualified for scholarships. Further, as the complaint and other exhibits suggest, the NCAA knew that using this approach would also screen out more black student athletes than white student athletes. So again, one could infer that, because the NCAA knew this, it was actually pursuing its stated goal and adopted means as a way to accomplish this sinister purpose while still seeming "laudable" and well intentioned. True, at first glance, some might well consider this theory far fetched. But we are reviewing this case at the pleading stage, not the summary judgment stage. Further, two allegations and the exhibits supporting them support the theory of the complaint: the NCAA openly considered race in formulating Proposition 16; and it had reason to know that the adoption of Proposition 16 would lead to the greater exclusion of black athletes from receiving college athletic scholarships.

Again, one may doubt that the NCAA harbored such ill motives. After all, many NCAA schools have long engaged in fierce recruiting contests to obtain the best high school athletes in the country, many of whom are black. And in today's world of collegiate athletics, better athletes can translate into more revenues and exposure for the schools that sign them. On the other hand, racial discrimination is nearly always irrational and thus, in the words of the Supreme Court, "odious" to our nation's principles of equality. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 214, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (citations omitted). Further, neither our court nor the district court can render "findings" in this case—at least not yet. And findings of fact, of course, turn on evidence, not on one's speculations about the issue. Nothing in our decision today precludes either summary judgment or trial findings that conclude the NCAA

did not intend to discriminate on the basis of race.

Second, even assuming the NCAA's assertion that it had only "laudable" goals in adopting Proposition 16 and that it actually wanted only to improve graduation rates among black student athletes, the NCAA has cited no authority holding that a claim for purposeful discrimination may lie only if the accused decisionmaker had "bad intentions" or "animus." Quite the contrary. The Court has squarely held that, well-intentioned or not, express or neutral on its face, a law or policy that purposefully discriminates on account of race is presumptively invalid and can survive only if it withstands strict scrutiny review. *See Adarand,* 515 U.S. at 227–29, 115 S.Ct. 2097 (strict scrutiny applied to federal government's system of giving financial incentives to general contractors who used "financially disadvantaged" subcontractors when the system also created via statute a presumption that certain racial groups qualified as "financially disadvantaged"); *Croson,* 488 U.S. at 493–94, 109 S.Ct. 706 (holding that "the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification" and that the single standard of review for racial classifications is "strict scrutiny"); *see also California Bd. of Regents v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (concluding in plurality opinion that programs designed to benefit minorities must withstand strict scrutiny; "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color" and "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination"); *accord Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 273, 106 S.Ct. 1842, 90 L.Ed.2d

260 (1986). As one court has put it: "When the government [or other decision-maker, *e.g.*, the NCAA] prefers individuals on account of their race or gender, it correspondingly disadvantages individuals who fortuitously belong to another race or to the other gender." *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir.1997) (upholding voter-enacted statute barring the adoption of any policies or laws by the State that would favor one race or gender over another). The persuasive authority cited by the NCAA does not warrant a contrary result. *E.g., id.* ("To be constitutional, a racial classification, *regardless of its purported motivation,* must be narrowly tailored to serve a compelling government interest, an extraordinary justification.") (emphasis added).

Admittedly, this case is not subject to easy categorization. It differs from many Supreme Court precedents in that one could read the complaint and attached exhibits as showing that the NCAA adopted Proposition 16 to benefit the parties now suing for intentional discrimination. *See, e.g. Arlington Heights, supra.* And it differs from *Adarand, Croson, Shaw v. Reno, Bakke* and other reverse-discrimination cases in that Plaintiffs here are not, say, white student athletes claiming the NCAA adopted a race-based policy at their expense. Again, putting aside the more sinister theory about the NCAA purposefully using Proposition 16 as a means to discriminate against black athletes, Plaintiffs' complaint can also be read as alleging that (1) the NCAA considered race when it adopted Proposition 16; (2) it did so for the "benign" or "laudable" goal of improving graduation rates among black student athletes; but (3) the policy for achieving that goal—Proposition 16—backfired and has instead worked to the detriment of black athletes.

■ We need not address whether this theory fits within the analytical framework established by the Supreme Court. As stated earlier, liberally reading the complaint (as we must), Plaintiffs also sufficiently allege that the NCAA adopted Proposition 16 for the malevolent purpose of excluding black student athletes from receiving scholarship aid and athletic eligibility. In this regard, we merely reiterate the Supreme Court's established view that a claim for purposeful discrimination may lie even if the decisionmaker adopted the allegedly discriminatory policy or rule at issue for a "beneficial" or "laudable" purpose.

4

■ As Plaintiffs have sufficiently alleged a claim of purposeful discrimination under the analysis set forth above, they need not establish their alternative theory about the NCAA acting with "deliberate indifference" to the impact of Proposition 16 in order to secure reversal of the total dismissal of the complaint. But as they continue to press this alternative theory, we must address and reject it. The Supreme Court has recently re-affirmed the principle that Title VI of the Civil Rights Act "directly reaches only instances of intentional discrimination." *Alexander v. Sandoval*, 532 U.S. at 281, 121 S.Ct. 1511. Plaintiffs try to sidestep this holding by claiming that the NCAA was not just indifferent to Proposition 16's alleged disparate impact on black athletes; it was extremely indifferent to that impact even if it did not intend to discriminate. Frankly, we see no meaningful difference between the proffered "deliberate indifference" standard and the rule, well settled by the Supreme Court, that a decisionmaker will not commit purposeful discrimination if it adopts a facially neutral policy "in spite of" its impact, not "because of" that impact. *See Feeney*, 442 U.S. at 279, 99 S.Ct. 2282.

Accordingly, we reject Plaintiffs' "deliberate indifference" standard as a cognizable theory of relief under Title VI.

The precedents that Plaintiffs rely on in this regard do not compel a different conclusion. In *Gebser v. Lago Vista Indep. School District,* 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), for example, the Supreme Court held that a school or other entity covered by Title IX could incur liability under that civil rights law if an entity official "with authority to take corrective action" (1) had "actual notice" about another employee's sexual harassment of a student; and (2) after receiving actual notice, that official was still "deliberately indifferent" to the intentional wrongdoing committed by the employee.

The problem with applying *Gebser's* "deliberately indifferent" standard to a Title VI purposeful-discrimination case is that that standard applies to one who sat by passively while another committed an intentional Title IX violation. Stated another way, the school in *Gebser* faced liability under Title IX not because it did anything intentionally wrong; it just sat by and did nothing at all. And again, in *Alexander v. Sandoval,* the Supreme Court held that an entity cannot incur liability under Title VI for anything short of intentional discrimination. So, if we accepted Plaintiffs' theory here, we would also have to cast the NCAA in the role of the *Gebser* school that committed a sin of omission, not a sin of commission. In so doing, we would effectively turn *Alexander* on its head, along with its prohibition against imposing liability for anything short of purposeful discrimination. We have no authority to do so.

In *Davis v. Scherer,* the Supreme Court said nothing about "deliberate indifference" or whether and when that standard should apply. *See* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). To the extent that Plaintiffs rely on it to show that entities subject to federal civil rights laws cannot simply turn a blind eye to a constitutional tort and thereby avert liability, the precedent similarly provides little guidance. In *Davis,* the Court addressed a state official's qualified immunity from damages under 42 U.S.C. § 1983 when that official, acting under the color of state law, had violated an individual's civil rights. *Id.* at 187–88, 104 S.Ct. 3012. Citing the difficulties with determining whether an intentional wrongdoer had acted in the "good faith" belief that he had violated no laws, the Court decided to retain its two-part immunity test for examining both the objective and subjective factors underlying the wrongdoer's state of mind. *See id.* at 191, 194–95, 104 S.Ct. 3012.

This analysis has no place in the Title VI context, for again it presupposes that an intentional act of wrongdoing occurred in the first instance. Here, at least insofar as they advance this alternative theory of relief, Plaintiffs claim not that the NCAA committed the purposeful discrimination required by Title VI and *Alexander;* but that the NCAA acted with such disregard to Plaintiffs' civil rights as to make that disregard an intentional wrongdoing in and of itself. Accepting this theory would again eviscerate the Supreme Court's ruling in *Alexander.*

Last, nor does the Sixth Circuit's decision in *Horner v. Kentucky High School Athletic Association* offer any compelling reason to merge the "deliberate indifference" standard with the "intentional discrimination" standard for imposing Title VI liability. *See* 206 F.3d 685, 692–93 (6th Cir.2000). There, in fact, the Sixth Circuit expressly declined to consider whether liability in the analogous Title IX context could lie when a Title IX entity—a school

association—allegedly adopted a facially neutral policy with "deliberate indifference" and thereby committed purposeful discrimination. *Id.* ("However, because of Plaintiffs' fundamental failure to establish a violation of Title IX, let alone an intentional violation, we need not adopt any test at this time.").

The *Horner* court did note, as *dicta*, that it could imagine a situation where "a deliberate indifference test might be appropriate," as "when [p]laintiffs claim that defendant school officials had actual knowledge of the disparate impact of their policies, either at the time of enactment or when subsequently brought to their attention post-enactment, and turn a blind eye." *Id.* at 693 n. 4. But that *dicta* is of course not binding. Nor is it persuasive: The Supreme Court has stated repeatedly that, as part of the fact-sensitive *Arlington Heights* inquiry, courts ought to consider a policy's impact along with the other factors used to assess whether a facially neutral policy was adopted with an intent to discriminate. We have found no authority in Supreme Court precedent to now conflate the tests or to otherwise dilute the purposeful discrimination standard of *Alexander v. Sandoval* and allow a Title VI claim to stand on the basis of what the Sixth Circuit itself has also recognized as the less-strict "deliberate indifference" standard. *See Horner*, 206 F.3d at 693 n. 4 (recognizing that the "discriminatory animus test" involves "a stricter standard" than the deliberate indifference test).

### C

■■■■■ Having determined that Plaintiffs have sufficiently alleged a claim for purposeful discrimination, we must also conclude that Plaintiffs have thereby satisfied two of the three elements of the § 1981 analysis. To establish a right to relief under § 1981, a plaintiff must show

(1) that he belongs to a racial minority; (2) "an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in" § 1981, including the right to make and enforce contracts. *Brown v. Philip Morris Inc.*, 250 F.3d at 797. The standard for establishing an "intent to discriminate on the basis of race" is identical in the Title VI and § 1981 contexts.

Here, the district court granted the motion to dismiss Plaintiffs' § 1981 claim because not only (in the court's view) did Plaintiffs fail to allege facts showing an intent to discriminate; but also because they failed to show that the NCAA had deprived them of their contract rights under the NLI. According to the district court, Plaintiffs agreed to the NLI condition that they satisfy the academic requirements of Proposition 16; and that Plaintiffs therefore received all their rights under their respective NLIs because they had simply failed to meet this condition, meaning the NLIs had by their own force become void.

■■■■■ This analysis is certainly logical. But it fails to account for the argument about the NLI condition resulting from the NCAA's alleged discrimination. (*See, e.g.,* Appellants' Br. at 41–42 (arguing that "just as 'racial discrimination is not just another competing consideration,' neither is a racially discriminatory contractual condition just another[contract] condition"); Pls.' Compl. ¶ 87 (suggesting that the NLI condition itself is "racially discriminatory")). In our view, this argument is persuasive. A contract term or condition that violates public policy is void and is thus unenforceable. *E.g., Development Fin. Corp. v. Alpha Housing & Health Care*, 54 F.3d 156, 163 (3d Cir.1995) ("The Pennsylvania Supreme Court applies the 'general rule that an agreement which violates a

provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void.' ") (quoting *American Ass'n of Meat Processors v. Cas. Reciprocal Exch.,* 588 A.2d 491, 495, 527 Pa. 59, 68 (1991)); *Shadis v. Beal,* 520 F.Supp. 858, 861 (E.D.Pa.1981) ("As a general rule, courts will not enforce contractual provisions that are illegal, and illegal in this sense has been defined as 'if either its formation or performance is criminal, tortuous, or otherwise opposed to public policy.' ") (citations omitted).

In the realm of contract law, the doctrine of public policy reflects principles of law already enumerated by the Constitution and state and federal law. *See id.* It follows that this doctrine may also void a contract term if that term offends the laws prohibiting racial discrimination. *Cf. Hicks v. Arthur,* 843 F.Supp. 949, 957 (E.D.Pa.1994) (discussing a claim for wrongful discharge under the public policy exception to the employment at-will doctrine, as well as § 1981, and stating that the "protection of employees from racial discrimination is without doubt a clearly mandated public policy"); *see also Spriggs v. Diamond Auto Glass,* 165 F.3d 1015, 1020 (4th Cir.1999) ("An employer may breach a contract for non-discriminatory reasons; this, of course, would not give rise to a § 1981 claim. Conversely, an employer may act in perfect accord with its contractual rights—for example, when it terminates an at-will employee—but it may still violate § 1981 if that action is racially discriminatory and affects one of the contractual aspects listed in § 1981.").

In this case, we have already determined that Plaintiffs have stated a claim for purposeful discrimination, meaning Plaintiffs have alleged facts sufficient to meet the second prong of § 1981 as well. Moreover, as the precedents above show, the NCAA could not avoid § 1981 liability

here simply because the Proposition 16 condition—an alleged product of purposeful discrimination—was not satisfied. *See, e.g., Spriggs, supra.* Rather, as Plaintiffs suggest, this condition is void on its face provided Plaintiffs can establish that the NCAA adopted Proposition 16 (and, thus, the condition contained in the Plaintiffs' NLIs) for the purpose of intentionally discriminating on the basis of race. For purposes of the NCAA's Rule 12(b)(6) motion, we hold that Plaintiffs have so established that point. Accordingly, the fact that the condition here was not performed does not serve as a basis for vitiating Plaintiffs' § 1981 claim. We therefore reverse and remand Plaintiffs' § 1981 claim too.

## V

While we appreciate the NCAA's burden of having to tend to numerous lawsuits alleging purposeful discrimination in the adoption of Proposition 16, neither the courts nor the NCAA nor any other civil litigant is free to ignore the rules of procedure, including the notice pleading provisions of Fed.R.Civ.P. 8 and 9. By the same token, parties suing the NCAA for such claims must be prepared to present evidence at the summary judgment stage that would substantiate their allegations. We express no opinion about whether Plaintiffs in this case can carry that burden.

For the reasons stated above, we affirm the dismissal of Plaintiff Pryor's ADA and Rehabilitation Act claims for want of constitutional standing. But we reverse the Rule 12(b)(6) dismissal of Plaintiffs' Title VI and § 1981 claims insofar as they rest on allegations of purposeful discrimination, not deliberate indifference. We remand for additional proceedings consistent with this opinion.