PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-3467

_____

DANIELLE SANTOMENNO, for the use and benefit of the
John Hancock Trust and the John Hancock Funds II; KAREN
POLEY and BARBARA POLEY for the use and benefit of
the John Hancock Funds II; DANIELLE SANTOMENNO,
KAREN POLEY and BARBARA POLEY individually and
on behalf of ERISA employee benefit plans that held, or
continue to hold, group variable annuity contracts issued/sold
by John Hancock Life Insurance Company (U.S.A.), and the
participants and beneficiaries of all such ERISA covered
employee benefit plans; and DANIELLE SANTOMENNO
individually and on behalf of any person or entity that is a
party to, or has acquired rights under, an individual or group
variable annuity contract that was issued/sold by John
Hancock Life Insurance Company (U.S.A.) where the
underlying investment was a John Hancock proprietary fund
contained in the John Hancock Trust

Danielle Santomenno;
Karen Poley;
Barbara Poley,
                    Appellants

v.

JOHN HANCOCK LIFE INSURANCE COMPANY
(U.S.A); JOHN HANCOCK INVESTMENT
MANAGEMENT SERVICES, LLC;
JOHN HANCOCK FUNDS; LLC,
JOHN HANCOCK DISTRIBUTORS, LLC

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. 2-10-cv-01655)
District Judge:  Honorable William J. Martini

_____

Argued June 12, 2014

Before:  FISHER, VAN ANTWERPEN and TASHIMA,[*]
*Circuit Judges*.

(Filed: September 26, 2014 )

Arnold C. Lakind, Esq.
Robert L. Lakind, Esq.
Robert E. Lytle, Esq.
Moshe Maimon, Esq.
Stephen Skillman, Esq.  **ARGUED**

_____

[*]The Honorable A. Wallace Tashima, Senior Circuit Judge
for the Ninth Circuit Court of Appeals, sitting by designation.

Szaferman, Lakind, Blumstein & Blader
101 Grovers Mill Road
Quakerbridge Executive Center, Suite 200
Lawrenceville, NJ 08648

    *Counsel for Appellants*


Daniel P. Condon, Esq.
Alison V. Douglass, Esq.
James O. Fleckner, Esq.  **ARGUED**
Goodwin Procter
53 State Street
Exchange Place
Boston, MA 02109

    *Counsel for Appellees*


Jonathon B. Lower, Esq.
Brian J. McMahon, Esq.
Gibbons
One Gateway Center
Newark, NJ 07102

    *Counsel for Appellees*


Radha Vishnuvajjala, Esq.  **ARGUED**
United States Department of Labor, Room N-4611
200 Constitution Avenue, N.W.
Washington, DC 20210

    *Counsel for Amicus Curiae* Secretary United States
Department of Labor

Eric S. Mattson, Esq.
Sidley Austin
One South Dearborn Street
Chicago, IL 60603

     *Counsel for Amicus Curiae* American Council of Life
Insurers

————

OPINION OF THE COURT

————

FISHER, *Circuit Judge*.

     Plaintiff-Appellants Danielle Santomenno, Karen Poley, and Barbara Poley (collectively, "Participants") invested money in 401(k) benefit plans. They brought suit on behalf of themselves and a putative class of benefit plans and plan participants that have held or continue to hold group annuity contracts with Defendant-Appellees John Hancock Life Insurance Company (U.S.A.), John Hancock Investment Management Services, LLC, John Hancock Funds, LLC, and John Hancock Distributors, LLC (collectively, "John Hancock"). They allege that John Hancock charged excessive fees for its services in breach of its fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. The District Court granted John Hancock's motion to dismiss, ruling that John Hancock was not a fiduciary with respect to the alleged breaches. We will affirm.

4

## I.

### A.

Participants were enrolled in the J&H Berge, Inc. 401(k) Profit Sharing Plan (the "Berge Plan") and the Scibal Associates, Inc. 401(k) Plan (the "Scibal Plan," and together with the Berge Plan, the "Plans"). 401(k) plans are a type of "defined contribution" plan governed by ERISA. Each of the Plans had a trustee, and the trustees contracted with John Hancock to provide a product known as a group variable annuity contract. As part of this product, John Hancock assembled for the Plans a variety of investment options into which Participants could direct their contributions. This collection of investment options was referred to as the "Big Menu," and was composed primarily of John Hancock mutual funds, such as the John Hancock Trust-Money Market Trust ("Money Market Trust"), but also included independent funds offered by other companies.

From the Big Menu created by John Hancock the trustees selected which investment options to offer to their Plan participants, known as the "Small Menu." Participants could then select from the options on the Small Menu where to invest their 401(k) contributions. Rather than investing each Participant's contributions directly into an investment option (for example, a mutual fund), John Hancock directed plan participants' contributions into separate sub-accounts, each of which was correlated with an underlying investment option. John Hancock would pool the contributions in the sub-accounts, and then invest them in the corresponding investment option. Plan trustees could select for their Small Menus any option off the Big Menu, as well as investments offered by companies other than John Hancock. *See* JA at 219, Berge Contract § 1 (defining "Competing Investment

5

Option" as a fund "available under the Plan, either in the Contract or elsewhere").

As part of its agreement with the Plans, John Hancock offered a product feature called the Fiduciary Standards Warranty ("FSW"). Plan trustees received this feature if they selected for their Small Menus at least nineteen funds offered by John Hancock, rather than independent funds. Under the FSW, John Hancock "warrants and covenants that the investment options Plan fiduciaries select to offer to Plan participants: Will satisfy the prudence requirement of . . . ERISA." JA at 59, Second Amended Complaint ("Complaint" or "SAC") ¶ 170. If a trustee constructed its Small Menu in accordance with the FSW, John Hancock agreed that it would reimburse the plan for any losses arising out of litigation challenging the prudence of the plan's investment selections, including litigation costs. In the FSW, John Hancock stated that it was "not a fiduciary," and that the FSW "does not guarantee that any particular Investment option is suited to the needs of any individual plan participant and, thus, does not cover any claims by any Individual participant based on the needs of, or suitability for, such participant." JA at 414. John Hancock also offered a service called the "Fund Check Fund Review and Scorecard." Through this program, John Hancock monitored the performance of all investment options on the Big Menu, distributed copies of its evaluations to plan trustees, and informed them as to changes in the Big Menu made in response to these evaluations.

When Participants invested in a particular sub-account, they were subject to three fees: an Administrative Maintenance Charge ("AMC"); a Sales & Service ("S&S") fee; and the fee charged by the underlying mutual fund, known as a 12b-1 fee after the provision in the securities

6

regulations that authorizes their payment out of plan assets. *See* 17 C.F.R. § 270.12b-1. The sum of these fees is referred to as the "expense ratio" for each sub-account.

John Hancock retained the authority to add, delete, or substitute the investment options it offered on the Big Menu. Under what it referred to as its "Underlying Fund Replacement Regimen," John Hancock reviewed investment options "on a daily, monthly, quarterly, and annual basis" and replaced them "[i]f it . . . determined that the investment option is no longer able to deliver its value proposition to [John Hancock's] clients and there is a viable replacement option." JA at 63, SAC ¶¶ 189-90. For example, in 2009, John Hancock removed the "John Hancock Classic Value Fund" and replaced it with the "T. Rowe Price Equity Income Fund." JA at 57, SAC ¶ 158. John Hancock also retained the authority to change the share class for each fund into which the Participants' contributions were invested. The expense ratio of a fund will depend, in part, on the share class in which it invests. Notwithstanding John Hancock's authority over the construction of the Big Menu and its selection of share classes, the trustees retained the responsibility for selecting investment options for inclusion in the Small Menu and for offering to Participants.

B.

Participants filed this suit on March 31, 2010, and filed a second amended complaint on October 22, 2010. Counts I through VII were brought under ERISA. Counts VIII and IX were brought under two provisions of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1 *et seq.* John Hancock moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), which the District Court granted in its entirety. With respect to the ERISA claims, the District

Court concluded that dismissal was proper because Participants did not make a pre-lawsuit demand and did not join the plan trustees in the suit. Participants appealed, and we affirmed dismissal of the ICA claims, but vacated the portion of the District Court's order dismissing the ERISA claims and remanded for further proceedings. *Santomenno v. John Hancock Life Ins. Co. (U.S.A.)*, 677 F.3d 178 (3d Cir. 2012). We concluded that the District Court's reliance on the common law of trusts to engraft pre-suit demand and mandatory joinder requirements was inconsistent with ERISA's intent. *Id.* at 189.

On remand, John Hancock renewed its motion to dismiss, raising a variety of arguments. Some of John Hancock's arguments were raised in its first motion to dismiss and some were not, and Participants asserted that John Hancock was barred from raising new arguments in its renewed motion. John Hancock's lack of fiduciary status, however, had been raised in the first motion, and the District Court decided the case solely on that basis. *See Santomenno v. John Hancock Life Ins. Co. (U.S.A.)*, No. 10-1655, 2013 WL 3864395, at *4 n.2 (D.N.J. July 24, 2013). The District Court granted the motion to dismiss, concluding that John Hancock was not an ERISA fiduciary with respect to any of the misconduct alleged in the complaint. Participants timely appealed. The Secretary of Labor filed an *amicus* brief in support of Participants urging reversal, and the American Council of Life Insurers ("ACLI"), filed an *amicus* brief in support of John Hancock urging affirmance.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). We have appellate jurisdiction over the District Court's final order of dismissal

8

pursuant to 28 U.S.C. § 1291, and our review of that order is plenary. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009).

In reviewing a motion to dismiss under Rule 12(b)(6), we treat as true all well-pleaded facts in the complaint, which we construe in the "'light most favorable to the plaintiff.'" *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). To survive a motion to dismiss, "a claimant must state a 'plausible' claim for relief, and '[a] claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Whether the facts alleged in the complaint adequately plead fiduciary status is a question we review de novo. *Srein v. Frankford Trust Co.*, 323 F.3d 214, 220 (3d Cir. 2003).

Generally, a court considering a motion to dismiss under Rule 12(b)(6) may consider only the allegations contained in the pleading to determine its sufficiency. *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002). "However, the court may consider documents which are attached to or submitted with the complaint, as well as . . . . documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading. . . ." *Id.* (emphasis omitted) (quoting 62 Fed. Proc., L.Ed. § 62:508). Similarly, "[d]ocuments that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim." *Id.* (emphasis omitted) (quoting 62 Fed. Proc., L.Ed.

§ 62:508). Accordingly, we may consider the Plan contracts and supporting documents in our disposition of this appeal.

III.

A.

ERISA is a "'comprehensive'" statute that is "the product of a decade of congressional study of the Nation's private employee benefit system." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)). Participants are enrolled in ERISA-regulated 401(k) plans. *See LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248, 255 (2008) (recognizing that "[d]efined contribution plans" – which include 401(k) plans – "dominate the retirement plan scene today"). ERISA imposes fiduciary responsibilities on certain persons. ERISA fiduciaries must act solely in the interest of the plan participants and beneficiaries and must act to "defray[] reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(ii). Participants assert breaches of fiduciary duties and prohibited transactions under 29 U.S.C. §§ 1104(a), 1106(a)-(b).

ERISA provides that a person is a fiduciary to a plan if the plan identifies them as such. *See* 29 U.S.C. § 1102(a). It also provides that:

> [A] person is a fiduciary with respect to a plan to the extent
>
> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A).

To be a fiduciary within the meaning of § 1002(21)(A), a person must "act[] in the capacity of manager, administrator, or financial advisor to a 'plan.'" *Pegram v. Herdrich*, 530 U.S. 211, 222 (2000). This so-called "functional" fiduciary duty is contextual – it arises "only to the extent" a person acts in an administrative, managerial, or advisory capacity to an employee benefits plan. *Id.* at 225-26 (internal quotation marks omitted). "Because an entity is only a fiduciary to the extent it possesses authority or discretionary control over the plan, we 'must ask whether [the entity] is a fiduciary with respect to the *particular activity in question.*'" *Renfro v. Unisys Corp.*, 671 F.3d 314, 321 (3d Cir. 2011) (emphasis added) (internal citations omitted) (quoting *Srein*, 323 F.3d at 221; and citing 29 U.S.C. §

11

1002(21)(A); *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009)). Thus, "the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226.

Before proceeding too deeply into our analysis, it is necessary first to clarify precisely what Participants claim in this case. Each Count that Participants levy against John Hancock alleges the charging of excessive fees in breach of fiduciary duty. *See* Participants' Br. at 12.[1] Counts I and II of the Complaint challenge payment of the S&S fees, alleging: (1) that contrary to John Hancock's claim that the S&S fees were used to pay for services by third parties, the S&S fees were in fact revenue for John Hancock; and (2) that the S&S fees were excessive because they were in excess of, and duplicative of, the underlying funds' 12b-1 fees. Counts III and IV allege that John Hancock breached its fiduciary responsibility by selecting for the Big Menu investment options that charged 12b-1 fees, claiming that John Hancock

_____

[1] Counts VI and VII alleged, respectively, that John Hancock wrongly included funds on the Big Menu that paid it revenue sharing, and that John Hancock breached its fiduciary duty by selecting a particular fund for inclusion on the Big Menu that allegedly carried high fees with low returns. At oral argument, counsel for Participants stated that while it was "not withdrawing these two counts," it was "limiting [them] to claims of excessive fees." Oral Arg. Rec. at 1:20-2:00. Accordingly, we consider forfeited any claims of wrongdoing other than the charging of excessive fees.

should have negotiated with the underlying funds for access to a share class that did not impose these fees. Count V alleges that John Hancock's Big Menu should not have included funds that paid certain advisor fees that Participants allege were excessive.

Participants state that "[t]he alleged breach of fiduciary duty consists solely of John Hancock charging excessive fees for the performance of its fiduciary functions." Reply Br. at 7. But this is not quite correct: the question in this case is not whether John Hancock acted as a fiduciary to the Plans at some point and in some manner and then charged an excessive fee for that fiduciary service; rather, the question is whether John Hancock acted as a fiduciary to the Plans with respect to the fees that it set. With that in mind, we now turn to the parties' arguments.[2]

B.

---

[2] John Hancock briefly argues that Participants lack standing to challenge any conduct by which they were not affected because they have not suffered an injury-in-fact. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). We reject this argument. As we will discuss, some of Participants' asserted grounds for fiduciary status lack a nexus with the wrongdoing alleged in the Complaint, and therefore cannot provide a basis for relief. But John Hancock's argument conflates the injuries pleaded in the Complaint – the monetary loss to the Plans caused by what Participants allege were excessive fees – with the fiduciary duties that Participants allege were breached. Participants have clearly alleged an injury-in-fact – monetary loss. Whether that injury was caused by John Hancock's breach of a fiduciary duty, and whether John Hancock had a fiduciary duty in the first place, are questions for the merits, not for standing.

Participants allege that John Hancock is an ERISA fiduciary because: (1) it exercised discretionary authority respecting management of the Plans; and (2) it rendered investment advice to the Plans for a fee.[3]  The Secretary joins some of Participants' arguments, and advances some of his own.  We will address each in turn.

1.

ERISA imposes a fiduciary duty on any person who "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets."  29 U.S.C. § 1002(21)(A)(i).  Subsection (i) is thus composed of two discrete activities: (1) the exercise of discretionary management or discretionary control over the *plan*; and (2) the exercise of any authority or control over the management or disposition of *plan assets*.  The two prongs of subsection (i) differentiate between "those who manage the plan in general, and those who manage the plan assets."  *Bd. of Trs. of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare*

---

[3] Participants argue in a single sentence that John Hancock is a fiduciary under subsection (iii) of 29 U.S.C. § 1002(21)(A), which imposes a fiduciary duty on any person "to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of [a] plan."  This brief aside is insufficient to preserve the argument, and thus we do not consider it.  *See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court." (omission in original) (quoting *Simmons v. City of Phila.*, 947 F.2d 1042, 1066 (3d Cir. 1991)) (internal quotation marks omitted).

*Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 272 (3d Cir. 2001). Participants argue that John Hancock is a fiduciary only under the first prong.

"Only discretionary acts of plan . . . management trigger fiduciary duties." *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 421-22 (3d Cir. 2013). Consequently, a service provider owes no fiduciary duty to a plan with respect to the terms of its service agreement if the plan trustee exercised final authority in deciding whether to accept or reject those terms. *See Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009), *supplemented by* 569 F.3d 708 (7th Cir. 2009). This makes sense: when a service provider and a plan trustee negotiate at arm's length over the terms of their agreement, discretionary control over plan management lies not with the service provider but with the trustee, who decides whether to agree to the service provider's terms.

The Seventh Circuit's decision in *Hecker* stands strongly for this point. There, participants in two 401(k) plans sued their plans' sponsor (Deere & Co.), record keeper (Fidelity Trust), and investment advisor (Fidelity Research), alleging breach of fiduciary duty for selecting investment options with excessive fees and costs, and by failing to disclose the fee structure. *Hecker*, 556 F.3d at 578. The plan participants alleged that Fidelity Trust had the necessary control to take on a fiduciary responsibility because it limited the selection of funds available under the plans to those managed by its sister company, Fidelity Research. *Id.* at 583. This was irrelevant, in the Seventh Circuit's view, because even if Fidelity Research limited the scope of funds available under its plan, it was ultimately the responsibility of the plan sponsor – Deere & Co. – to decide which options to offer to plan participants. *Id.* Fidelity Trust therefore lacked the discretion necessary to confer upon it a fiduciary

responsibility.

Two years later, we decided *Renfro*. The allegations in *Renfro* were similar to those made here: plan participants sued not only the plan's sponsor, but also the service provider, Fidelity Management Trust Co., alleging breach of fiduciary duty by selecting for the plan investment options that carried excessive fees. 671 F.3d at 317, 319. Fidelity conceded that it was a fiduciary with respect to certain functions, but argued that it was not a fiduciary "with respect to the challenged conduct of selecting and retaining investment options" in the plan. *Id.* at 322-23.[4] There, like John Hancock argues here, Fidelity disclaimed any role in making the final decision on what investment options to offer plan participants. *Compare id.* at 323 ("The agreement expressly disclaimed any role for Fidelity in selecting investment options, stating, '[Fidelity entities] shall have no responsibility for the selection of investment options under the Trust.'"), *with* JA at 220, Berge Contract § 3 ("Contributions remitted to this Contract may be invested only in the Investment Options selected by the Contractholder"), *and* JA at 278, Scibal Contract § 3 (same). Also like this case, the sponsor in *Renfro* was free to include in its plan funds not offered by Fidelity. *Compare* 671 F.3d at 319 ("The agreement did not prohibit Unisys from adding non-Fidelity options to its plan, and administering them itself, or from contracting with another company to administer non-Fidelity investments."), *with* JA at 219, Berge Contract § 1 (defining "Competing Investment Option" as a fund

---

[4] Fidelity was a "directed trustee," which "is a fiduciary 'subject to proper directions' of one of the plan's named fiduciaries." *Renfro*, 671 F.3d at 323 (quoting 29 U.S.C. § 1103(a)(1)).

16

"available under the Plan, either in the Contract or elsewhere").

We concluded that, because Fidelity had "no contractual authority to control the mix and range of investment options, to veto" the sponsor's selections, or to prevent the sponsor from offering competing investment options, it lacked the discretionary authority necessary to create a fiduciary responsibility as to these activities. *Renfro*, 671 F.3d at 323. We further noted, relying on *Hecker*, that a service provider "'does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms.'" *Id.* at 324 (quoting *Hecker*, 556 F.3d at 583). The plan participants alleged that they were injured by excessive fees caused by the fee structure that the plan sponsor and Fidelity had negotiated, but "Fidelity owe[d] no fiduciary duty with respect to the negotiation of its fee compensation." *Id.*

The Seventh Circuit's recent decision in *Leimkuehler v. American United Life Insurance Co.*, 713 F.3d 905 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1280 (2014), provides a final point of guidance. In *Leimkuehler*, a plan and its trustee sued the 401(k) service provider, American United Life Insurance Co. ("AUL"), alleging that AUL breached a fiduciary duty by engaging in the practice of revenue sharing. *Id.* at 907-08. Under AUL's revenue sharing plan, it received a portion of the fees charged by the underlying mutual funds to plan participants. *Id.* at 909. Like here, AUL created a big menu of funds that it offered to the plan sponsor, who in turn composed a small menu to offer to the plan participants. *Id.* at 910. Also like here, plan participants invested their contributions into separate accounts, which in turn were invested in specific mutual funds. *Id.* at 908. In addition to selecting which funds to include on its big menu, AUL chose

17

what share class would be offered, which in turn affected the expense ratio paid by plan participants and the amount of AUL's revenue sharing. *Id.* at 909-10.

The Seventh Circuit concluded that AUL was not a fiduciary with respect to revenue sharing. First, just as in *Hecker*, AUL did not take on a fiduciary status with respect to its "product design" – that is, the manner in which it crafted its menu of investment options and what funds and share classes it elected to include (and the accompanying expense ratios of those options). *Id.* at 911. This was so because the expense ratio for each fund AUL offered was fully disclosed, and the plan sponsor "was free to seek a better deal with a different 401(k) service provider if he felt that AUL's investment options were too expensive." *Id.* at 912. Second, the court rejected the argument that AUL's maintenance of separate sub-accounts created a fiduciary duty because the alleged breach of fiduciary duty did not involve mismanagement of the separate accounts. *Id.* at 913 ("AUL's control over the separate account can support a finding of fiduciary status only if Leimkuehler's claims for breach of fiduciary duty arise from AUL's handling of the separate account. They do not." (paragraph break omitted)).

Participants here identify three actions that purportedly made John Hancock a fiduciary under the first prong of subsection (i). They allege that John Hancock was a fiduciary because it selected the investment options to be included in the Big Menu, because it monitored the performance of the funds on the Big Menu, and because, under the terms of its contracts with the Berge and Scibal Plans, it had the authority to add, remove, or substitute the investment options that it offered to the Plans and to alter the fees it charged for its services. *See* Participants' Br. at 2. Participants' position is that "once a party has [the] status of a functional fiduciary,

18

they have all the obligations that ERISA imposes upon them, and those obligations include the obligation not to charge excessive fees." Oral Arg. Rec. at 5:18-5:35.

Participants' first argument is foreclosed by *Renfro*, *Hecker*, and *Leimkuehler*, which together make clear that John Hancock is not a fiduciary with respect to the manner in which it composed the Big Menu, including its selection of investment options and the accompanying fee structure. The Big Menu's fund selections and expense ratios are "product design" features of the type that *Leimkuehler* concluded do not give rise to a fiduciary duty. 713 F.3d at 911 ("[S]electing which funds will be included in a particular 401(k) investment product, without more, does not give rise to a fiduciary responsibility . . . ."). Moreover, we expressly stated in *Renfro* that a service provider "owes no fiduciary duty with respect to the negotiation of its fee compensation." 671 F.3d at 324.[5] Here, even if they were incentivized to select certain funds by John Hancock's promise of indemnification in the FSW, the trustees still exercised final authority over what funds would be included on the Small

---

[5] Participants argue that *Renfro*'s holding that a service provider has no fiduciary duty in the negotiation of its fee compensation is dictum that we are not obliged to follow. Participants' Br. at 35-36. We disagree. *Renfro* rejected the argument that Fidelity could be liable as a co-fiduciary with the plan sponsor for excessive fees and the selection of investment options, because it simply *was not a fiduciary* with respect to that conduct. *See* 671 F.3d at 324; *see also* 29 U.S.C. § 1105(a) (allowing "a *fiduciary* . . . [to] be liable for a breach of fiduciary responsibility *of another fiduciary*" (emphasis added)).

Menus (and, by extension, what the accompanying expense ratios would be). Nothing prevented the trustees from rejecting John Hancock's product and selecting another service provider; the choice was theirs. *See Hecker*, 556 F.3d at 583 (recognizing that "a service provider does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms").[6]

---

[6] Participants urge that the District Court erred in following *Renfro* and *Leimkuehler*, and that instead we should take guidance from two out-of-circuit district court decisions, *Charters v. John Hancock Life Insurance Co.*, 583 F. Supp. 2d 189 (D. Mass. 2008), and *Santomenno v. Transamerica Life Insurance Co.*, No. 12-2782, 2013 WL 603901 (C.D. Cal. Feb. 19, 2013). We find neither case persuasive.

The plaintiff in *Charters* sued the service provider over AMC revenue and for receiving revenue sharing paid by the underlying mutual funds. 583 F. Supp. 2d at 192. The district court concluded that the provider was a fiduciary because its contract gave it discretion to set the AMC up to a contractual maximum or exceed the contractual maximum upon three-months' notice to the sponsor, and because it imposed a 2% termination fee, which the district court believed limited the sponsor's ability to freely reject changes. *Id.* 197-99. We find *Charters* unavailing. First, it predates *Renfro* and *Leimkuehler*, and for that reason alone the persuasive value of its holding that a service provider owes a fiduciary duty with respect to its fee arrangement is sharply diminished. Second, in this case, John Hancock did not impose a penalty, and therefore there is no obstacle to cancellation that limits the trustees' discretion to reject

Participants' second argument is that John Hancock became a fiduciary by monitoring the performance of the investment options offered on the Big Menu through its Fund Check and Underlying Fund Replacement Regimen programs. Participants' Br. at 34. But we do not see how monitoring the performance of the funds that it offers and relaying that information to the trustees, who retain ultimate authority for selecting the funds to be included on the Small Menus, gives John Hancock discretionary control over anything, much less management of the Plans. *See, e.g*, JA at 399 (stating in the FSW that "Plan fiduciaries are still

---

proposed changes.

*Transamerica* is even less persuasive. There, the district court rejected *Hecker*'s holding that a service provider has no fiduciary duty with respect to the terms of its compensation if the named fiduciary is free to negotiate and approve or reject the contract, calling it "formalistic line-drawing" that would lead to the "*reductio ad absurdum*" of allowing a service provider to negotiate for a 99% fee. *Transamerica*, 2013 WL 603901, at *6. First, this reasoning is flatly inconsistent with our controlling decision in *Renfro*, which cited *Hecker* with approval for the proposition that there is no fiduciary duty with regard to contract negotiations. *See* 671 F.3d at 324. Second, as John Hancock correctly observes, *Transamerica*'s logic is flawed because any plan sponsor who agreed to a 99% fee arrangement would *itself* be liable for breaching its fiduciary duty to "defray[] reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(ii). Therefore, it is unnecessary to impose a fiduciary duty on the service provider in order to protect plan assets from excessive fees.

required to properly discharge their responsibilities in determining that John Hancock's investment process and fund lineup is appropriate for their plan").

Participants' third argument – that John Hancock became a fiduciary by retaining the authority to change the investment options offered on the Big Menu and alter the fees that it charged – likewise fails. Reply Br. at 16; JA at 226, Berge Contract § 15. First, this activity lacks a nexus with the conduct complained of in the Complaint. As John Hancock and *amicus* ACLI observe, Participants do not allege that John Hancock breached a fiduciary duty by altering an investment option on the Big Menu or by altering their fees. Rather, their claim is that the fees John Hancock charged (which, as we note above, the Plan sponsors were free to accept or reject) were excessive. Participants urge that focusing on their specific allegations is a feint designed "to set the stage for John Hancock arguing . . . that [Participants'] arguments regarding John Hancock's status as an ERISA fiduciary are not properly pled and therefore should not be considered." Reply Br. at 3. But in fact the opposite is true: it is clear that a complaint alleging breach of ERISA fiduciary duty must plead that the defendant was acting as a fiduciary "*when taking the action subject to complaint*." *Pegram*, 530 U.S. at 226 (emphasis added). Lacking this nexus, John Hancock's alleged ability to alter its funds or fees cannot give rise to a fiduciary duty in this case. *Cf. Leimkuehler*, 713 F.3d at 913 (recognizing that "control over [a] separate account can support a finding of fiduciary status *only if* [the] claims for breach of fiduciary duty *arise from* [the] handling of the separate account" (emphasis added)). Second, even assuming a nexus between the alleged breach and John Hancock's ability to substitute funds, Participants still fail to show that John Hancock exercised the discretion over plan management

22

necessary to make it a fiduciary. Although John Hancock did have the contractual right to alter the Big Menu or change its fees, it could do so only after giving the trustee "adequate notice and sufficient information to decide whether to accept or reject any changes that would be fiduciary decisions." *Id.* If the trustee rejected the changes, he could "terminate the Contract without penalty."[7] *Id.* Thus, ultimate authority still resided with the trustees, who had the choice whether to accept or reject John Hancock's changes.

Participants' attempt to establish that John Hancock acted as a fiduciary under subsection (i) of 29 U.S.C. § 1002(21)(A) fails because its arguments are foreclosed by precedent or lack a nexus with the claims in the Complaint, and we conclude that the District Court did not err in rejecting their arguments.

2.

Participants argue that John Hancock is an ERISA fiduciary because it has "render[ed] investment advice [to the Plans] for a fee or other compensation." 29 U.S.C. § 1002(21)(A)(ii). At the outset, this alleged basis of fiduciary responsibility bears no nexus to the wrongdoing alleged in the Complaint: Participants allege the charging of excessive fees, not the rendering of faulty investment advice. *See*

---

[7] The Berge Plan indicates that "[d]iscontinuance and other charges may still be available" upon cancellation "in accordance with the terms of the Contract and the Charge Schedule." JA at 226, Berge Contract § 15. However, both Plans indicate that the discontinuance fee was "0.000%." JA at 230, Berge Contract Withdrawal/Discontinuance Charge Scale; JA at 291, Scibal Contract Withdrawal and Discontinuance Charge Scales.

23

*Leimkuehler*, 713 F.3d at 913-14.  But even if there were such a nexus, we would reject this argument because Participants have failed to plead that John Hancock was an investment advice fiduciary within the meaning of ERISA.

The Department of Labor ("DOL" or "Department") has promulgated a regulation setting forth a five-factor test for determining whether an entity has rendered "investment advice" for purposes of ERISA fiduciary status.  An entity is an investment advice fiduciary if it:

> [1] [R]ender[ed] advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property . . . [2] on a regular basis . . . [3] pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, [4] that such services will serve as a primary basis for investment decisions with respect to plan assets, and [5] that such person will render individualized investment advice to the plan based on the particular needs of the plan.

29 C.F.R. § 2510.3-21(c)(1).  "All five factors are necessary to support a finding of fiduciary status." *Thomas, Head &*

24

*Griesen Emps. Trust v. Buster*, 24 F.3d 1114, 1117 (9th Cir. 1994).

As a threshold matter, Participants argue that the DOL regulation is invalid as contrary to the plain language of § 1002(21)(A)(ii). In support of this argument, they first suggest that the Department no longer stands by the regulation because it "engrafts additional requirements for establishing fiduciary status under 29 U.S.C. § 1002(21)(A)(ii) that narrow the plain language of this subsection." Participants' Br. at 21. Notably, the Secretary does not join this argument, and for good reason.

The regulation dates to 1975, and in 2010 the DOL proposed a new rule that would have broadened the circumstances in which a person would be deemed an ERISA fiduciary by reason of having rendered investment advice. *See* Definition of the Term "Fiduciary," 75 Fed. Reg. 65263 (proposed Oct. 22, 2010). However, in a press release issued on September 19, 2011, the Department stated that it would "re-propose" the rule in order to "benefit from additional input, review and consideration." *See* News Release, U.S. Dep't of Labor, US Labor Department's EBSA to Re-Propose Rule on Definition of a Fiduciary (Sept. 19, 2011), *available at* http://www.dol.gov/ebsa/newsroom/2011/11-1382-NAT.html. The parties dispute whether the Department actually "withdrew" consideration of the new rule, but whether it did so or not is irrelevant because the new rule has not been adopted, and unless and until it becomes law, the current regulation remains binding. *See Depenbrock v. Cigna Corp.*, 389 F.3d 78, 85 (3d Cir. 2004).

We defer to the Department's reasonable interpretation of ambiguous provisions of ERISA. *See Matinchek v. John Alden Life Ins. Co.*, 93 F.3d 96, 100-01 (3d Cir. 1996); *see*

25

*also Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-33 (1984). While acknowledging that the DOL's proposed regulation never went into effect, Participants argue that its mere proposal somehow weakens the deference we owe the current regulation under *Chevron*. This is incorrect because "a proposed regulation does not represent an agency's considered interpretation of its statute," *Depenbrock*, 389 F.3d at 85 (internal quotation marks omitted) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986)), and therefore it does not supplant a prior regulation that *was* the result of the agency's considered interpretation. *See Littriello v. United States*, 484 F.3d 372, 379 (6th Cir. 2007) ("Plainly, an agency does not lose its entitlement to *Chevron* deference merely because it subsequently proposes a different approach in its regulations.").

Thus, the normal *Chevron* analysis applies. Under that familiar rubric, "we ask first 'whether Congress has directly spoken to the precise question at issue. If so, courts, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Eid v. Thompson*, 740 F.3d 118, 123 (3d Cir. 2014) (quoting *United States v. Geiser*, 527 F.3d 288, 292 (3d Cir. 2008)). If, on the other hand, the statute is ambiguous as to the question at hand, "we give 'controlling weight' to the agency's interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Id.* (quoting *Geiser*, 527 F.3d at 292).

Participants marshal little in the way of support for their *Chevron* argument. Section 1002(21)(A)(ii) imposes fiduciary status on any person who "renders investment advice for a fee or other compensation." Participants tautologically argue, then, that "Congress has unambiguously expressed its intent that any party who renders investment

advice for a fee is an ERISA fiduciary." Participants' Br. at 22 (internal quotation marks omitted). This is true insofar as that is what the statute says, but this observation tells us nothing about what the provision means. "*Chevron* deference is premised on the idea that where Congress has left a gap or ambiguity in a statute within an agency's jurisdiction, that agency has the power to fill in or clarify the relevant provisions." *Core Commc'ns, Inc. v. Verizon Pa. Inc.*, 493 F.3d 333, 343 (3d Cir. 2007) (citing *Chevron*, 467 U.S. at 843-44). ERISA does not define "investment advice," nor does it provide a way to determine when such an advisory relationship has occurred. This is precisely the type of legislative gap-filling that we entrust to an agency's sound discretion.[8]

The DOL regulation is valid, and under it Participants have failed to plead that John Hancock was an investment advice fiduciary. In order for a fiduciary relationship to arise under subsection (ii), John Hancock must have rendered investment advice to the plans "pursuant to a mutual agreement, arrangement or understanding." 29 C.F.R. § 2510.3-21(c)(1)(ii)(B). Participants argue that a mutually understood advisory relationship existed because "John Hancock provide[d] . . . investment advice pursuant to contracts entered into with employer sponsors such as Berge and Scibal." Participants' Br. at 23. But far from showing mutual assent to an advisory relationship, the contracts between the Plans and John Hancock show just the opposite: that John Hancock expressly disclaimed taking on any

---

[8] Participants do not even attempt to argue *Chevron* step two, that the DOL regulation is arbitrary, capricious, or manifestly contrary to the statute. *See* Participants' Br. at 22.

fiduciary relationship. *See* JA at 226, Berge Contract § 15 ("[John Hancock] does not assume the responsibility of the Contractholder, Plan Administrator, Plan Sponsor or any other Fiduciary of the Plan . . . ."); JA at 285, Scibal Contract § 17 ("By performing these services, [John Hancock] does not assume the responsibility of the Contractholder, Plan Administrator or any other Fiduciary of the Plan."). Similarly, in the FSW John Hancock stated that "we are not a fiduciary." JA at 414. It is true that, subject to limited exceptions not relevant here, ERISA precludes fiduciaries from contracting away their responsibilities. *See* 29 U.S.C. § 1110(a) ("[A]ny provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."); *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 593 (3d Cir. 2009). But this does not answer the question of whether John Hancock has taken on fiduciary status in the first place. Participants point only to the contracts themselves as support for the existence of a mutually assented-to advisory relationship between the parties, but the terms of the contracts belie their argument.

This alone is enough to defeat Participants' argument and we need not proceed further. *Buster*, 24 F.3d at 1117. Participants have failed to satisfactorily plead that John Hancock was an investment advice fiduciary under ERISA.

3.

The Secretary argues that John Hancock had fiduciary status under both prongs of subsection (i), and as a plan administrator under subsection (iii). We reject these arguments as meritless or waived.

The Secretary first argues that John Hancock exercised

28

"discretionary authority or discretionary control" over plan management under the first prong of 29 U.S.C. § 1002(21)(A)(i), because it retained "the authority to unilaterally delete and substitute" investment options from the Big Menu, even if it did not actually exercise that authority. Sec'y of Labor Br. at 15. The Seventh Circuit rejected this precise argument in *Leimkuehler*, describing it as an "unworkable" "'non-exercise' theory of exercise" that "conflicts with a common-sense understanding of the meaning of 'exercise,' is unsupported by precedent, and would expand fiduciary responsibilities under Section 1002(21)(A) to entities that took no action at all with respect to a plan." 713 F.3d at 914. "Section 1002(21)(A)'s 'reach is limited to circumstances where the individual actually exercises some authority.'" *Id.* (quoting *Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 733 (8th Cir. 2008)). Moreover, whether John Hancock could substitute investment options on the Big Menu is not relevant to the injury that Participants allege, charging excessive fees.

Next, the Secretary argues that John Hancock was a fiduciary because it "exercise[d] . . . authority or control respecting management or disposition of [Plan] assets," *see* 29 U.S.C. § 1002(21)(A)(i), and because it had discretionary control over plan administration, *id.* § 1002(21)(A)(iii). Both arguments are waived. As we noted above, Participants have not argued that John Hancock exercised control over plan assets, and their single-sentence reference to plan-administrator fiduciary status failed to preserve that argument. *Laborers' Int'l*, 26 F.3d at 398. The Secretary cannot, as *amicus*, resurrect on appeal issues waived by Participants. *See N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 383 n.2 (3d Cir. 2012) ("'Although an

*amicus* brief can be helpful in elaborating issues properly presented by the parties, it is normally not a method for injecting new issues into an appeal, at least in cases where the parties are competently represented by counsel.'" (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001)).

## IV.

For the reasons that we have discussed, we conclude that Participants have failed to plead that John Hancock was a fiduciary under ERISA with respect to the actions of John Hancock that Participants challenge. The order of the District Court granting John Hancock's motion to dismiss is affirmed.