**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2759
_____

J.D. ECKMAN, INC.,
Appellant

v.

STARR INDEMNITY & LIABILITY COMPANY
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:23-cv-01361)
District Judge: Hon. Harvey Bartle, III
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 14, 2025
_____

Before: SHWARTZ, MATEY, and MONTGOMERY-REEVES, <u>Circuit Judges</u>.

(Filed: December 12, 2025)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

PER CURIAM

J.D. Eckman, Inc. ("Eckman") appeals the District Court's order granting Starr Indemnity and Liability Company's ("Starr") motion to dismiss Eckman's complaint seeking insurance coverage. Because language relating to the policy's aggregate limit is ambiguous in the context of Starr's policy, we will vacate and remand for further proceedings.

I[1]

Eckman, a construction company, purchased (1) a primary insurance policy from Arch Insurance Company (the "Arch Policy"), which contains a general aggregate limit[2] of $2 million and a per occurrence limit of $1 million, and (2) three excess insurance policies, each issued by different insurers. Great American Insurance Company issued the first excess policy (the "GA Policy"), which provides an aggregate limit and a per occurrence limit of $1 million each. The GA Policy includes a "follow form" provision[3] stating that its coverage "shall follow form and be in accordance with the insuring

---

[1] We accept as true the facts set forth in the complaint. See Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.), 768 F.3d 284, 290 (3d Cir. 2014).

[2] "[A]n aggregate limit is the maximum amount the insurer will pay for all events that occur within a policy period." Int'l Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co., 998 F.2d 504, 505 (7th Cir. 1993).

[3] Generally, follow-form provisions incorporate into the excess policy "the same terms and conditions as the primary policy" but do not incorporate the primary policy's "liability limit." Kropa v. Gateway Ford, 974 A.2d 502, 505 n.2 (Pa. Super. Ct. 2009) (citation omitted); see also Allan D. Windt, Insurance Claims and Disputes § 6:2 (6th ed. 2025); Jordan Plitt et al., Couch on Insurance § 220:32 (3d ed. 2025).

2

agreements, exclusions, definitions and conditions contained in the [Arch Policy[4]]," subject to exceptions, including the "Limits on Insurance" provided above. App. 11, 22, 45. The GA Policy also provides that its aggregate limit "is the most we will pay for all 'loss' that is subject to an aggregate limit provided by the [Arch Policy]" and "applies separately and in the same manner as the [Arch Policy's] aggregate limits." App. 52.

Starr issued the second excess policy (the "Starr Policy"), which contains a $4 million "Each Occurrence" limit and a $4 million "Other Aggregate(s)" limit. App. 7. The policy defines "Other Aggregate Limit" as

> the most we will pay for all 'Ultimate Net Loss' . . . that is subject to an aggregate limit provided by the [GA Policy]. The Other Aggregate Limit . . . applies separately and in the same manner as the aggregate limits provided by the [GA Policy[5]].

App. 11, 68.[6] "Ultimate Net Loss" is "the total sum, after reduction for all recoveries including other valid and collectible insurance, excepting only [Arch and GA[7]], actually paid or payable due to a claim or suit for which [Eckman] or an Insured are liable either by a settlement to which we agreed or a final judgment." App. 68. The Starr Policy also contains a follow-form provision that states

---

[4] The three instances of bracketed language in this paragraph replace "first underlying insurance" App. 11, 52, which the GA policy identifies as the Arch Policy.

[5] Both instances of bracketed language in this quotation replace "First Underlying Insurance Policy(ies)," App. 11, which the Starr Policy identifies as the GA Policy, App. 60, 63.

[6] This provision excludes certain "Ultimate Net Loss" covered under the products-completed operations hazard," which is not applicable here. App. 11, 68.

[7] This bracketed language replaces "the 'Underlying Insurance' scheduled under **ITEM 5.** of the Declarations," App. 68, which the Starr Policy identifies as the Arch and GA Policies.

"[e]xcept for the terms, definitions, conditions and exclusions of this Policy, the coverage provided by this Policy shall follow the terms, definitions, conditions and exclusions of the [GA Policy[8]]." App. 67. An endorsement to the Starr Policy states, "except where [its policy terms are] inconsistent" with the Arch or GA Policies, it follows the terms of Arch and GA Policies.[9] App. 82.

During a single policy period, two accidents occurred at two Eckman projects. After the second accident, Eckman sought confirmation that the Starr Policy's $4 million aggregate limit applied on a per-project basis, meaning that Eckman had up to $4 million of coverage for the second accident, which occurred at a different project from the first accident. Starr advised that "although the Starr Policy contains a per project aggregate of $4 [million]," its "per project aggregate is subject to a $4 [million] overall policy aggregate limit." App. 10. Thus, according to Starr, Eckman could not recover more than $4 million total from Starr for claims occurring in that policy period, even if they arose from different projects.

Eckman sued Starr, seeking a declaration that the Starr Policy contains a $4 million aggregate limit per project. Starr moved to dismiss, contending that the policy limit was a total of $4 million for the policy period. Dist. Ct. Dkt. ECF 7-2 at 1. The

---

[8] This bracketed language replaces "applicable First Underlying Insurance Policy(ies) shown in **ITEM 5.A** of the Declarations," App. 67, which the Starr Policy identifies as the GA Policy.
[9] Allied World National Assurance Company issued the third excess policy that is not relevant here.

District Court agreed, finding that the policy's aggregate limit was $4 million overall, not per project, and dismissed the complaint.  See J.D. Eckman, Inc. v. Starr Indem. & Liab. Co., Civ. No. 23-1361, 2023 WL 5651979, at *5 (E.D. Pa. Aug. 31, 2023).  It reasoned that (1) Starr's Policy's plain language that $4 million is "the most [it] will pay for all 'Ultimate Net Loss'" unambiguously provides an overall $4 million aggregate limit, (2) the limit is consistent with the Starr Policy's follow form and limits provisions, (3) Eckman's interpretation of the Starr Policy is unreasonable because it could lead to virtually unlimited coverage, and (4) the reasonable expectations doctrine does not apply here because Eckman is a sophisticated party, and the policy is unambiguous.  Id. at *3-5.

Eckman appeals.

II[10]

To resolve this appeal, we must examine the language of the Starr Policy and the two underlying policies whose terms the Starr Policy incorporates, in one way or another. When interpreting an insurance contract under Pennsylvania law,[11] we must ascertain and

---

[10] The District Court had jurisdiction under 28 U.S.C. § 1332.  We have jurisdiction under 28 U.S.C. § 1291.  We exercise plenary review of an order granting a motion to dismiss for failure to state a claim.  Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220 (3d Cir. 2011).  We must determine whether the complaint, construed "in the light most favorable to the plaintiff," Santomenno, 768 F.3d at 290, "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)), "but we disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements," James v. City of Wilkes-Barre, 700 F.3d 675, 679 (3d Cir. 2012).  We may consider "documents which are attached to or submitted with the complaint," Santomenno, 768 F.3d at 290 (quotations omitted), and thus, consider the policies Eckman attached to its complaint.

[11] The parties agree that Pennsylvania law governs our analysis.

5

give effect to the parties' intent as manifested in the terms of the policy. Donegal Mut. Ins. Co. v. Baumhammers, 938 A.2d 286, 290 (Pa. 2007). Where the language is clear and unambiguous, we must follow it. Minn. Fire & Cas. Co. v. Greenfield, 855 A.2d 854, 861 (Pa. 2004). Where the contract language is ambiguous, we construe it in favor of the insured. Id. "Contractual language is ambiguous if 'it is reasonably susceptible of different [interpretations] and capable of being understood in more than one sense.'" Gardner v. State Farm Fire & Cas. Co., 544 F.3d 553, 558 (3d Cir. 2008) (quoting Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986)). Courts should "read policy provisions to avoid ambiguities, if possible, and not torture the language to create them." St. Paul Fire & Marine Ins. Co. v. U.S. Fire Ins. Co., 655 F.2d 521, 524 (3d Cir. 1981) (applying Pennsylvania law); see also Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) ("We will not . . . distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity."). Instead, "[w]hen analyzing an insurance policy, a court must construe words of common usage in their natural, plain, and ordinary sense." Kropa v. Gateway Ford, 974 A.2d 502, 508 (Pa. Super. Ct. 2008) (internal quotation marks omitted).

Applying these principles, we believe the Starr Policy's Other Aggregate Limit is ambiguous. Because the Starr Policy's key language is substantially identical to key language in the GA Policy, and because each policy in Eckman's insurance tower, at least through the Starr Policy, incorporates terms from the policy beneath it, explaining the

Starr Policy's ambiguity requires us to start from the bottom of the insurance tower and work our way upward.

As all agree, the Arch Policy has only two aggregate limits, and the one relevant here—the $2 million "Designated Construction Project General Aggregate Limit"— applies on a per-project basis. App. 17. So Arch will pay up to $2 million for all "damages caused by [qualifying] 'occurrences'" on each of Eckman's covered projects. *Id.*

Then we come to the GA Policy—and encounter ambiguity. The GA Policy says it will follow the Arch Policy's form, except as to the Arch Policy's "Limits of Insurance" (which include the Designated Construction Project General Aggregate Limit just discussed).[12] App. 45. But then the GA Policy says its $1 million aggregate limit "is the most we will pay for *all 'loss'* that is subject to an aggregate limit provided by" the Arch Policy, except for certain excluded loss-causing events. App. 52 (emphasis added). These two provisions are in tension. On one hand, the exclusion for the Arch Policy's "Limits of Insurance" means that, although the GA Policy generally follows the Arch Policy's form, that form-following does not bring along the Arch Policy's per-project limit. On the other hand, the GA Policy says its aggregate limit applies to "all 'loss' that is subject to an aggregate limit" in the Arch Policy, and then provides that the GA

_____

[12] The GA Policy lists several additional exclusions that are not relevant here.

7

Policy's aggregate limit will "appl[y] separately and in the same manner as the aggregate limits provided by the [Arch Policy]." App. 52. This creates ambiguity.

Together, the two provisions in the GA Policy could be read narrowly: The GA Policy might aggregate losses for all loss-types that would qualify for coverage (and thus contribute to any of the aggregate limits) in the Arch Policy for purposes of its own general aggregate limit. App. 53 (setting off and excluding from coverage certain loss-types). But there is a broader reading: The Arch Policy covers loss on a per-project basis, so up to $1 million of loss, per project, is "subject to an aggregate limit" in the Arch Policy. App. 52. Up to $1 million of loss per project could therefore be subject to the aggregate limit in the GA Policy.[13] This latter interpretation essentially reincorporates the scope—though not the dollar amount—of the Arch Policy's Designated Construction Project General Aggregate Limit, which the GA Policy arguably had excised from its follow-form provision a few pages before. It is unclear which—partial reincorporation or full excision—the parties intended.

Finally, we arrive at the Starr Policy. Its $4 million "Other Aggregate Limit . . . is the most [Starr] will pay for all 'Ultimate Net Loss' . . . that is subject to an aggregate limit provided by the [GA Policy].'" App. 68. The District Court appropriately

---

[13] To illustrate, suppose Eckman operates two projects, A and B. If Eckman becomes liable for $6 million in qualifying damage on project A, it would be covered for the full $6 million on project A: $1 million from Arch, $1 million from GA, and $4 million from Starr. If Eckman then becomes liable for $6 million in qualifying damage on project B, that loss is still "subject to an aggregate limit" in the Arch Policy, App. 52, because it is subject to the Arch Policy's per-project Designated Construction Project General Aggregate Limit. It would then be subject to a $1 million aggregate limit in the GA Policy.

8

addressed that provision up to the phrase "all 'Ultimate Net Loss,'" but it did not consider the final clause. Because that clause indicates that Starr will cover losses subject to an aggregate limit provided by the GA Policy, and it is unclear whether the GA Policy makes project-specific losses subject to their own, per-project aggregate limit or one general aggregate limit, the Starr Policy is also ambiguous.[14] If the GA Policy fully excised the Arch Policy's per-project aggregate limit, the Starr Policy would refer to a GA Policy with no per-project aggregate limit and thus would not contain such a limit itself. If, however, the "all 'loss'" clause in the GA Policy, App. 52, reincorporated the Arch Policy's per-project aggregate limit, Starr's decision to mirror the scope of the GA Policy's aggregate limits would leave it with a $4 million-per-project aggregate limit.

Because the Starr Policy's aggregate limit language is ambiguous,[15] we will vacate and remand for further proceedings, including discovery concerning evidence that may enable the District Court to interpret ambiguous language.

[14] The principle that following-form excess insurers follow underlying policies "except to the extent that there is a conflict between the two policies, in which case the . . . excess policy will control," Lexington Ins. Co. v. W. Pa. Hosp., 318 F. Supp. 2d 279, 274 n.3 (W.D. Pa. 2004), aff'd, 423 F.3d 318 (3d Cir. 2005) (quoting Barry R. Ostrager, et al., Handbook on Insurance Coverage Disputes 817–18 (11th ed., Aspen L. & Bus. 2002)), is not dispositive because the GA and Starr Policies do not merely follow form. They also include the "subject to an aggregate limit" clauses which may indicate their limit terms were meant to be consistent with the underlying policy's aggregate limit.

[15] We are not persuaded that Colony Ins. Co. v. Aspen Specialty Ins. Co., 564 F. Supp. 3d 343 (D.N.J. 2021) or JRD Unico, Inc. v. Starr Indem. & Liability Co., 206 A.D.3d 427 (N.Y. App. Div. 2022) foreclose this interpretation, as Starr suggests. Colony involved a clause that at first appears similar; the insurance agreement identified a dollar amount as "the most we will pay under this policy for all damages." 564 F. Supp. 3d at 353. But the Colony policy was not limited by a clause like the "subject to an aggregate limit" language that links the Starr Policy's Other Aggregate Limit to the

III

For the foregoing reasons, we will vacate and remand for further proceedings.

---

aggregate limits in the GA Policy and the Arch Policy.  In JRD Unico, the underlying policy whose form Starr's policy followed combined a per-location limit with an explicit and comprehensive all-locations limit—unlike the Starr policy here, which incorporates Arch's limits, which do not include a comprehensive all-projects limit. See JRD Unico, Inc. v. Starr Indem. & Liab. Co., 2021 WL 4895307, at *2 (N.Y. Sup. Ct. Oct. 20, 2021) (defining the overall aggregate limit as "the most we will pay under Coverages A and B for the sum of all Limits of Insurance . . . regardless of the number of your 'locations.'"). Moreover, the cited decision arose in a summary judgment posture; the trial court drew on interpretive evidence, like premium amounts, that is unavailable here and that the parties may develop in discovery on remand.  See id. at *3.

10